STATE of Alaska, Appellant,

v.

FIRST NATIONAL BANK OF KETCHIKAN, Appellee.

No. 5371.

Supreme Court of Alaska.

June 5, 1981.

---

William G. Mellow, Asst. Atty. Gen. and Wilson L. Condon, Atty. Gen., Juneau, for appellant.

Mary E. Guss and Clifford H. Smith, Ziegler, Cloudy, Smith, King & Brown, Ketchikan, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and BLAIR, Superior Court Judge.

## OPINION

RABINOWITZ, Chief Justice.

The State of Alaska, through the Department of Commerce and Economic Development, provides low interest loans to small businesses that meet certain specified eligibility requirements. AS 45.95.010–.080. In the spring of 1978 Carl E. Jones, owner of a logging business known as Jones & Sons, Inc., applied for a loan under this program. On November 22, 1978, the State approved a loan in the amount of $150,000 to Jones, subject to three conditions: 1) visual inspection by a State official of the equipment that was to serve as collateral, 2) insurance coverage on the equipment, and 3) execution of an assignment to the State of Jones's interest in contracts he had entered into with M & S Forest Products, Inc. The third of these conditions was not satisfied [1] and, consequently, the loan was not closed on December 6, 1978, as had been intended.

On November 27, 1978, Jones applied to the First National Bank of Ketchikan (hereinafter "Bank") for a short-term loan of $30,000, which he needed to make timely payment of employees' wages and, apparently, to exercise an option on a truck that was to be used in his business. This loan was to be repaid out of the $150,000 loan from the State immediately upon disbursal of those funds.[2] The Bank approved the application later on the same day and immediately paid over $30,000 to Jones.

Jones appeared at the Bank's place of business on December 6, 1978, shortly after it opened for the day and announced that the State was not prepared to close the loan at that time. That afternoon Jones flew from Ketchikan to Seattle, where he placed a telephone call to his wife to explain that he was attending a business meeting there. Although the Bank has been informed that Jones has initiated bankruptcy proceedings and that he has been seen in Arkansas, it appears that he has not disclosed his whereabouts to either his family or his business associates since his sudden departure on December 6. On learning of Jones's absence, the Bank demanded that the State reimburse it for the loss it incurred in extending the short-term loan to Jones. The State refused to meet that demand and this lawsuit followed.

At trial, the circumstances surrounding the Bank's approval of Jones's loan application were the subject of some dispute. This dispute centered on the content of two telephone calls placed by employees of the Bank to David Massey, a loan examiner for the Department of Commerce and Economic Development, on November 27, 1978.

---

1. Jones did execute a purported assignment, but the State was unwilling to accept it because Jones had included in it a provision making the assignment revocable at his option.

2. Although there is no written agreement establishing Jones's obligation to repay the Bank out of the State loan, it is agreed that repayment would have been a condition of disbursal of the $150,000. The parties therefore do not attach significance to the fact that the Bank's written agreement with Jones provided for repayment 90 days from the date the loan was made.

Ronald Taylor, a loan officer for the Bank, testified that he had done the preliminary screening of Jones's application and that, in performing that function, he had called Massey to verify Jones's claim that his application for a small business loan had been approved by the State. According to Taylor, Massey assured him that the $150,000 loan was ready to be closed and that the State's representative would "be down on the 6th of December to sign the papers." Taylor testified further that he had explained to Massey that the Bank was willing to loan $30,000 to Jones on a short-term basis only, and that it expected repayment to be made directly by the State. According to Taylor's testimony, Massey responded that he "[didn't] see any problem" and that "everything [was] set to go." After this conversation had taken place, Taylor passed the application along to his supervisor, loan administrator Bruce Penoske, with the recommendation that it be approved. Penoske then called Massey himself to double-check the accuracy of Taylor's information. Penoske's testimony was that this conversation was brief and that he "just basically reaffirmed everything that Ron [Taylor] told me."

Massey's recollection of these conversations differed significantly from that of the Bank's employees. He agreed that he had told Taylor that the State had approved a loan of $150,000 to Jones. But he went on to testify that in response to Taylor's inquiry as to the closing date of the loan, he had said that December 6 would be "the first time we possibly can [close the loan]" and that "it's very doubtful we can get it done." Massey claimed at trial that he had told Taylor that Jones had yet to satisfy the loan conditions and that, for that reason, the State had not yet begun to prepare the appropriate documents. He also testified that although he "assumed there was [a] . . . pretty good chance they would do it," he was not specifically informed that the Bank intended to loan Jones $30,000. Concerning his conversation with Penoske, Massey claimed to have repeated that "we would in fact have a lot of trouble getting everything together to close on [December 6], we might be able to do the documents, but the money would be almost impossible by then."

The Bank initially sought recovery on the basis of alternative theories of promissory estoppel and negligence. At trial, however, it abandoned the negligence claim and based its case solely on the promissory estoppel theory. Its position was that in approving the short-term loan, Taylor and Penoske reasonably relied on Massey's assurances that the small business loan would be closed on December 6 and that the $30,000 loan extended by the Bank would be immediately repaid when the State loan funds were disbursed. Damages in the amount of $30,108, which included the cost of an insurance policy on Jones's life during the period of the loan in addition to the amount loaned, were claimed.

The State moved for summary judgment before trial and for a directed verdict after the Bank had presented its case. When the jury returned a verdict awarding the Bank the full $30,108 it had sought, the State moved for a new trial and, in the alternative, remittitur. This appeal raises essentially the same issues as did the State's various motions, all of which were denied by the superior court.

The State's primary attack on the superior court's judgment is based on that court's treatment of the promissory estoppel doctrine. Both parties agree that *Restatement of Contracts* § 90 (1932) is determinative of this issue. That section reads:

PROMISE REASONABLY INDUCING DEFINITE AND SUBSTANTIAL ACTION.

A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.[3]

PROMISE REASONABLY INDUCING ACTION OR FORBEARANCE.

**3.** The tentative draft of Restatement (Second) of Contracts (Tent. Draft No. 2, 1965) has made minor changes in § 90. The draft reads:

We have adopted this formulation of the promissory estoppel doctrine, *Slaymaker v. Peterkin*, 518 P.2d 763, 766 (Alaska 1974), and agree that it governs resolution of this issue.

Corbin identifies four elements necessary to a successful section 90 action: a) that the action induced "must amount to a substantial change of position," 2) that the action induced must have been either actually foreseen or reasonably foreseeable by the promisor, 3) that "an actual promise must have been made" and "must itself have induced the action or forbearance in reliance on it," and 4) that enforcement must be necessary in the interest of justice. 1A A. Corbin, *Corbin on Contracts* § 200, at 215–21 (1963). This analysis is reflected in the case law of several jurisdictions. *See, e. g., Southern California Acoustics Co. v. C. V. Holder, Inc.*, 71 Cal.2d 719, 79 Cal.Rptr. 319, 323, 456 P.2d 975, 979 (1969); *Owens v. City of Bartlett, Labette County*, 215 Kan. 840, 528 P.2d 1235, 1239 (1974); *Northern State Construction Co. v. Robbins*, 76 Wash.2d 357, 457 P.2d 187, 190 (1969).

■ Viewing the testimony in the light most favorable to the non-moving party, as we are bound to in reviewing the superior court's refusal to grant a motion for directed verdict, *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974), we conclude that the superior court erred in denying the state's motion for a directed verdict. For we are of the view that the Bank as a matter of law failed to meet the fourth requirement of promissory estoppel identified by Corbin.

■ Concerning the fourth requirement, we note that the Bank's evidence indicated only that Massey had promised that the State would be prepared to close its loan to Jones on December 6, 1978, and that it would pay $30,000 to the Bank when the loan funds were disbursed. The State could not have compelled Jones to sign the closing documents nor could it have disbursed any of the proceeds without Jones's cooperation. The State's promise was to have the closing documents in Ketchikan and ready for Jones's signature on December 6; it did not and could not promise unconditionally to close the loan or to disburse funds, since it is undisputed that neither of these actions could have been performed without Jones's presence and cooperation. Even taken in the light most favorable to the Bank, the evidence introduced at trial leads us to the conclusion that enforcement of the State's promise is not necessary in the interest of justice. Under the circumstances, we must agree with the State's claim that the real cause of the Bank's loss was its misplaced reliance on Jones, not the materiality of the State's promise to the Bank. It is undisputed that had Jones proven to be the trustworthy businessman that the Bank believed he was, the State's failure to perform its promise would have resulted in nothing more than a two-week delay in the closing of its loan to Jones. And it is clear that, as Taylor conceded, a two-week delay was "no big concern." Since we are convinced that the Bank's loss was caused by its own erroneous judgment as to Jones's character rather than by its reliance on the State's promise, we do not believe that justice would be served by requiring the State to bear the loss occasioned when Jones absconded with $30,000 on loan from the Bank. Further, the State's promise was that it would loan money to Jones on the 6th of December. However, as we have indicated above, the promise was understood to be conditional on obtaining Jones's cooperation in executing the necessary loan documents. This condition was not met because Jones failed to execute the necessary assignment. Therefore, the State has

---

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

The alterations would have no effect on the outcome of the present case.

not breached the promise, and there is no occasion to require its judicial enforcement. In our view, reasonable persons could not differ on this question.[4] We therefore hold that the superior court erred in refusing to direct a verdict in favor of the State.

In view of our determination of the promissory estoppel issue, there is no need to reach the State's other arguments.

4. We have previously held that:

The essence of the doctrine of quasi-estoppel is the existence of facts and circumstances making the assertion of an inconsistent position unconscionable. This determination is essentially a factual one and, as such, is one which will not be disturbed on appeal unless the findings on which it is based are clearly erroneous.

*Jamison v. Consolidated Utilities, Inc.*, 576 P.2d 97, 102 (Alaska 1978). This same reasoning applies to the promissory estoppel doctrine, and the question of whether "injustice can be avoided only be enforcement of the promise," *see* Restatement of Contracts § 90 (1932), must be treated as a question of fact.

The superior court's judgment is RE-VERSED and REMANDED for entry of a directed verdict in favor of the State.

COMPTON, J., not participating.

The standard of review to be applied in this situation was set out in *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974) (footnote omitted):

It is well established that the proper role of this court, on review of motions for directed verdict or for judgment notwithstanding the verdict, is not to weigh conflicting evidence or judge of the credibility of the witnesses, but is rather to determine whether the evidence, when viewed in the light most favorable to the nonmoving party, is such that reasonable men could not differ in their judgment.