**ALASKA BUSSELL ELECTRIC COM-
PANY, Appellant/Cross-Appellee,**

v.

**VERN HICKEL CONSTRUCTION CO.,
Appellee/Cross-Appellant.**

**No. 7727/7762.**

Supreme Court of Alaska.

July 27, 1984.

As Modified on Rehearing,
Sept. 7, 1984;
Rehearing Denied in All
Other Respects

H. Craig Schmidt, William M. Bankston, Bankston & McCollum, Anchorage, for appellant/cross-appellee.

Joseph N. Barcott and Jermain, Dunnagan & Owen, Anchorage, for appellee/cross-appellant.

Before BURKE, C.J., and RABINOW-ITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

Alaska Bussell Electric Company (Bussell) appeals the judgment of the superior court entered pursuant to the special jury verdict. The jury held that Bussell was liable to Vern Hickel Construction (Hickel) on a theory of promissory estoppel for refusing to perform according to the terms of Bussell's bid. Hickel cross-appeals the trial court's judgment awarding Hickel less than the requested measure of damages. We affirm.

## I. FACTUAL BACKGROUND

Bussell is an electrical subcontractor. Hickel is a general contractor. Both operate in the Anchorage area. Their dispute concerns a 1979 United States Air Force contract to build a commissary at Elmendorf Air Force Base.

On July 17, 1979, the Air Force opened bids on the project. On that day, Bussell called Hickel to submit its bid for the electrical portion of the project.[1] Bussell stated it could do the entire job for $477,498, and made no exclusions.

Hickel submitted its primary bid to the Air Force allegedly incorporating Bussell's bid of $477,498. However, the amount actually included in Hickel's bid for the electrical portion of the project was $488,606. Hickel received at least eight electrical subcontracting bids, the lowest of which was Bussell's. The next lowest bids were $564,697[2] and $632,649.

Hickel learned at the bid opening on July 17, 1979, that it was the low bidder. Patrick Brodigan, Bussell's electrical estimator, also attended the opening and learned that Bussell was the low bidder. He soon became aware that Bussell's bid was too low. He discussed Bussell's bid with the representative from Alcan Electric, a competitor. After comparing numbers, the two felt that the spread between their bids was too large to be correct. They determined that the problem was omission of the site work.

That evening, Brodigan and Roger Spencer, president of Bussell Electric, decided it would be unwise to try to absorb the additional cost, which they approximated to be between $70,000 and $80,000. On July 19, they met with Hickel (owner of Hickel Construction) and Helzer (project manager at the time) in Hickel's offices to discuss the omission. The parties dispute the content of that conversation.

Bussell contends that it informed Hickel that its bid was withdrawn because doing the job for the price bid would force Bussell into bankruptcy. Allegedly, Spencer specifically stated that he would not negotiate the bid under any circumstances as it was wrong to do so after completion of the bidding process.

Hickel's understanding, however, was based on a different version of the July 19

---

1. It is customary in the construction trade for local subcontractors to bid within the last few hours. Generally, as in this case, the bids are not verified before incorporating them into the principal bid.

2. This is Alcan Electric's original bid. Alcan later revised its bid to $552,679, then to $538,-290 and eventually to a further reduced price of $535,523. The intermediate bid of $578,290 was used by Hickel to calculate the reimbursement owed by Bussell. Alcan performed the work.

meeting. Hickel described the situation as a subcontractor making the low bid and then returning to the general contractor to ask for more money to cover work the subcontractor had left out of the initial bid.

Both sides testified that Bussell wanted to go to the Air Force and explain that Bussell had made a mistake.[3] Bussell offered to file a claim with the Air Force, and to place its attorneys at Hickel's disposal. However, Hickel insisted that Bussell not contact the Air Force and Bussell, therefore, did not do so. Hickel responded to Bussell's request and offers with a cryptic offer to help once Hickel Construction had been awarded the contract. Hickel offered to cooperate, process legitimate change orders and to do the paperwork.

Bussell alleges that Hickel stated that after the Air Force had awarded the contract, Hickel would look into getting some relief for Bussell. Hickel claims to have promised only to minimize Bussell's financial exposure by timely payment, provision of storage for materials on the job site, and coordination of the work through Hickel's superintendent.

Bussell sent Hickel a letter dated July 23, 1979 to confirm the meeting of July 19 and to briefly discuss the subject of that meeting. However, the letter left ambiguous Bussell's position on whether to perform the contract or withdraw its bid. Brodigan informed Hickel that the bid was about $70,000 low due to a "neglectful omission" and asked that Hickel allow Bussell "consideration in re-evaluating this omission."

Upon request, Bussell wrote Hickel Construction a letter of confirmation dated July 30 to substantiate the original bid of July 17. Bussell believed the purpose of such a letter was to provide documentation of the error and the difference between Bussell's bid and the next lowest bid which Hickel would substitute for the electrical portion of the work. According to Bussell, Hickel asked that the letter omit any mention that Bussell would not perform the work or that an error had been made in its bid. Hickel's project manager testified that he interpreted the July 30 letter as an election by Bussell to do the work.[4]

Hickel was awarded the Air Force contract on August 20, 1979. The parties met on August 22, 1979. Bussell testified that it went to the meeting expecting that Hickel would now process Bussell's withdrawal since it had received the government contract. However, Hickel announced it had received the job and Bussell was expected to perform the work. Bussell left the meeting promptly without looking at the contract Hickel had drafted.

Spencer wrote a letter on August 23 outlining Bussell's position. He observed in that letter that without Bussell's low bid, Hickel would not have been low bidder.[5] Hickel asserted that Bussell had made a judgment error and that a change or withdrawal was legally and financially impossible. Hickel asked Bussell to reimburse Hickel $60,792, the difference between Bussell's and Alcan's bids, and Bussell refused to do so. At trial, Hickel requested $58,025 in damages since Alcan eventually reduced its price to $535,523.[6]

Hickel filed its complaint on January 18, 1980 and an amended complaint on March 12, 1980. Bussell requested a jury trial. Both parties made motions for summary judgment. In oral argument on these motions, Bussell observed that each party had submitted Genuine Issues of Fact in its opposition to its opponent's motion.

3. Bussell hoped that an explanation of the error would result in the award of the electrical work to the next lowest bidder.

4. In a letter dated October 29, 1979, Helzer of Hickel Construction stated that it was the letter of July 23 which convinced him that Bussell would do the work at the bid price.

5. On several occasions, Bussell claimed that Hickel would not have been low bidder but for Bussell's omission. However, in its motion for summary judgment Bussell states: "Even if Hickel had allowed Bussell to correct its bid to include the site work plus full overhead and profit, Hickel would still have been the low bidder by $1,473.25."

6. See note 2, supra.

Hence, Bussell withdrew its motion and argued that the court should deny Hickel's motion. The motion was denied. On three occasions, Bussell moved unsuccessfully for a directed verdict. After a jury trial, a special verdict was entered against Bussell for $43,432. Bussell moved for judgment notwithstanding the verdict, which the court denied. Both Hickel and Bussell filed timely Notices of Appeal.

## II. APPLICATION OF PROMISSORY ESTOPPEL DOCTRINE

Hickel reasserts that it relied upon Bussell's bid and on an implied promise that it would not be revoked. Bussell argues that Hickel's judgment rests on an improper application of the doctrine of promissory estoppel and that contract principles of offer and acceptance should control this case.

This case was properly submitted to the jury on principles of promissory estoppel and contract law. The parties disputed the terms, if any, of the agreement reached after Bussell advised Hickel of its error. They disagreed on what the intended remedy was to be. Bussell used equivocal language in its letters dated July 23 and 30, 1979 to Hickel, leaving open the question of whether it had withdrawn its bid, or, in the alternative, wanted Hickel to apply to the Air Force for an amendment to cover the additional cost to be paid to Bussell. The jury clearly decided, as expressed in its special verdict, that no contract had been formed. It also decided that the elements of promissory estoppel were present.

We have not previously had occasion to apply the theory of promissory estoppel to construction industry disputes over the bidding process. However, we have recognized the doctrine in other contexts. *See Glover v. Sager*, 667 P.2d 1198 (Alaska 1983); *Johnson v. Curran*, 633 P.2d 994 (Alaska 1981); *State v. First National Bank of Ketchikan*, 629 P.2d 78 (Alaska 1981).

In *Glover*, 667 P.2d at 1202, we recognized that pursuant to *State v. First National Bank of Ketchikan, supra*, Alaska has adopted the Restatement (Second) of Contracts, Section 90.[7] Section 90 provides in relevant part:

Promise Reasonably Inducing Action or Forbearance

(1) A promise which the promissor should reasonably expect to induce action or forbearance on the part of the promisee ... and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Quoting from *State v. First National Bank of Ketchikan*, 629 P.2d at 81, the *Glover* court states:

Corbin identifies four elements necessary to a successful section 90 action: a) [sic] that the action induced "must amount to a substantial change in position," 2) that the action induced must have been either actually foreseen or reasonably foreseeable by the promissor, 3) that "an actual promise must have been made" and "must itself have induced the action or forbearance in reliance on it," and 4) that enforcement must be necessary in the interest of justice.

667 P.2d at 1202.

The jurisdictions which have applied promissory estoppel to construction industry bidding disputes are split as to the scope of the doctrine. The two leading cases on application of the doctrine are *James Baird Co. v. Gimbel Bros., Inc.*, 64 F.2d 344 (2d Cir.1933), and *Drennan v. Star Paving Company*, 51 Cal.2d 409, 333 P.2d 757 (1958). *Baird* formulated the narrower view. The facts in *Baird* were similar to those in the present case. The court found that since the bid was withdrawn before acceptance, the acceptance was too late. It refused to apply the doctrine of promissory estoppel, since a charitable ven-

**7.** Section 90 of Restatement (First) of Contracts was virtually the same and would not alter the outcome in this case. The original section 90 was acknowledged in *Slaymaker v. Peterkin*, 518

P.2d 763, 766 (Alaska 1974) and *Dresser Industries v. Foss Launch and Tug Company*, 560 P.2d 393, 396 (Alaska 1977).

ture was not involved and since the bid was not meant to be an offer until consideration was supplied. *Id.* 64 F.2d at 346.

*Drennan v. Star Paving Company,* 51 Cal.2d 409, 333 P.2d 757 (1958) sets forth a broader application of promissory estoppel to construction industry bidding disputes. In *Drennan,* the court found that "Defendant's [subcontractor's] offer constituted a promise to perform on such conditions as were stated expressly or by implication therein or annexed thereto by operation of law." 333 P.2d at 759. Since the subcontractor's bid was silent as to revocability, the court implied a subsidiary promise that the bid would not be revoked and that if the subcontractor subsequently received an offer to contract he would accept. 333 P.2d at 760. Thus the court analogized the subcontractor's bid to a unilateral or option contract.

In defense of this position, the *Drennan* court said:

> Though defendant did not bargain for this use of its bid neither did defendant make it idly, indifferent to whether it would be used or not. On the contrary it is reasonable to suppose that defendant submitted its bid to obtain the subcontract. It was bound to realize the substantial possibility that its bid would be the lowest, and that it would be included by plaintiff in his bid. It was to its own interest that the contractor be awarded the general contract; ... Given this interest and the fact that plaintiff is bound by his own bid, it is only fair that plaintiff should have at least an opportunity to accept defendant's bid after the general contract has been awarded to him.

333 P.2d at 760. The court reached this conclusion despite a finding that:

> There is no evidence that defendant offered to make its bid irrevocable in exchange for plaintiff's use of its figures in computing his bid. Nor is there evidence that would warrant interpreting plaintiff's use of defendant's bid as the acceptance thereof, binding plaintiff, on

condition he received the main contract, to award the subcontract to defendant. 333 P.2d at 759.

We recognize the risk to subcontractors posed by a broad reading of the doctrine of promissory estoppel. As one commentator has noted

> Although promissory estoppel does at least protect the general contractor from the damages he would suffer if his only recourse were to the traditional rules of offer and acceptance, application of the doctrine in its present form is questionable because it binds the subcontractor while the general contractor is free to subcontract someone else, and because it is difficult to prove its various elements, particularly justifiable reliance.

Comment, *Construction Bidding Problem: Is There A Solution Fair to Both The General Contractor and Subcontractor?,* 19 St.Louis L.J. 552, 566 (1975).

■ However, we believe that *Drennan* is better case law than *Baird.* As applied in *Drennan,* promissory estoppel has the practical effect of encouraging subcontractors to be cautious when formulating their bids. Furthermore, it satisfies the needs of the modern construction industry. *See* Closen and Weiland, *The Construction Industry Bidding Cases: Application of Traditional Contract, Promissory Estoppel, and Other Theories To The Relations Between General Contractors and Subcontractors,* 13 J.Mar.L.Rev. 565 (1980).

It is industry custom for subcontractors to submit bids at the last moment. Closen and Weiland, *supra,* at 574. This trade practice has evolved because of the industry demands for firm, current prices. The custom is facilitated by the ease with which a bid can be placed without the formalities of contract. However, if a contractor is to deliver a set price to an owner, these bids must be binding for a reasonable time. This operates to the benefit of the construction industry. Promissory estoppel, as applied in *Drennan* and adopted by this court, is a necessary element of this scheme.

In the case at bar, the jury was asked three questions to determine the presence of the elements of promissory estoppel: whether it was more likely than not (1) that Bussell promised Hickel that Bussell would perform for the amount of the bid, (2) that Bussell reasonably should have expected that Vern Hickel Construction would take definite and substantial action in reliance upon the promise, and (3) that Vern Hickel Construction Company took definite and substantial action in reliance upon Bussell's promise. The jury answered yes to all three questions, as well as answering that Hickel Construction had not waived its right to seek damages against Bussell. No instruction was requested as to the fourth element of promissory estoppel, that is, that enforcement be necessary in the interest of justice, and Bussell does not challenge on appeal the omission of this element from the instruction.[8]

 The jury's factual findings, if supported by the evidence presented at trial, will not be disturbed where there is room for diversity of opinion among reasonable people. *Levar v. Elkins*, 604 P.2d 602 (Alaska 1980). We conclude that the testimony of the parties was conflicting and the trial court properly denied Bussell's motion for judgment notwithstanding the verdict.

## III. DAMAGES

 Bussell argues that the trial court erred in failing to ask the jury in the special verdict form whether Hickel could have mitigated all or part of his damage claim. We reject this argument. In a separate instruction the jury was properly instructed on the mitigation of damages issue. It

is within the sound discretion of the trial court to select those questions the jury is required to answer in a special verdict form. *Healey v. Catalyst Recovery of Pennsylvania, Inc.*, 616 F.2d 641, 648–49 (3d Cir.1980). "Moreover, it is not error to refuse to submit a question or instruction where the issue is adequately covered by other questions or instructions." *Perzinski v. Chevron Chemical Company*, 503 F.2d 654, 660 (7th Cir.1974) (citations omitted). We find no error or abuse of discretion by the trial court on this issue.[9]

On the other hand, Hickel argues that the jury reduced damages to $43,432 instead of awarding the claimed damages of $58,025, based upon an apportionment of blame or equities, rather than following the court's instruction on mitigation of damages.

Hickel supports his argument on the basis that the jury, before retiring in the evening, submitted the following question to the court: "Can damages be awarded on a basis of percentage of blame for the problem as determined by the jury?" Bussell wanted the question to be answered "yes" and Hickel wanted it answered "no". The court did neither but chose to submit the following instruction as its answer:

Damages calculations in this case are governed by instructions 16, 17, 18 and 19. Other instructions which relate specifically to the decision whether or not damages should be awarded are instructions 12, 13, 14 and 15. If you decide that damages should be awarded, you must follow the law as it is given to you in the instructions, and your award, if you make one, must be based solely on

8. Following *Hoffman v. Red Owl Stores*, 26 Wis.2d 683, 133 N.W.2d 277 (1965), the Alaska Pattern Jury Instructions reserve this fourth question for the judge. We express no opinion on the correctness of this reservation. Nor do we decide whether the Second Restatement's last sentence, "The remedy for breach may be limited as justice requires," calls for action by the judge or by the jury.

9. Bussell also argues that the trial court should have given an anticipatory repudiation instruction. Anticipatory repudiation is a contract doctrine and the jury found that no contract was formed. In doing so, it implicitly decided that Hickel made no legally binding counter-promises to Bussell. Even if the doctrine of anticipatory repudiation applies to Section 90 cases, a question we do not reach, there were no legally binding promises which Hickel might have repudiated.

the instructions and the evidence in this case.

The difference between Alcan's final revised bid and Bussell's bid was $58,025.[10] Thus, this is the starting point for damages, and the amount Hickel's counsel requested in closing argument.

Hickel submitted its bid allowing $488,606 for electrical. However, Bussell's bid for the entire electrical portion was only $477,498. Therefore, Hickel was not damaged by the entire difference between Alcan's and Bussell's bid; rather, it was damaged only by the difference between what the Air Force compensated them for electrical and the cost of having Alcan do the entire job. This reduces the damages by $11,108.[11]

Alcan, the subcontractor who did the job, offered an additional savings. This amount was divided among the contractor, subcontractor and the Air Force. As a result, Hickel saved another $3,485.

The final computation indicates that the jury could reasonably and legally have deducted $14,593 from the requested measure of damages.[12] Thus, $43,432 was a proper determination of damages.[13]

We conclude that the trial court properly answered the jury question and the evidence in the record supports the damages awarded Hickel by the jury.

AFFIRMED.

---

10. $535,523 (Alcan) — $477,498 (Bussell) = $58,025.

11. $488,606 – 477,498 = $11,108.

12. $11,108 – 3,485 = $14,593.

13. $58,025 – 14,593 = $43,432.