George CROOK, R.J. Braunschweig,
Louis Braunschweig, NGC Investment
& Development, Inc., d/b/a Window
Supply Company, Contractors Bonding
& Insurance Company, Appellants,

v.

MORTENSON–NEAL, A Joint
Venture, Appellee.

No. S–951.

Supreme Court of Alaska.

Oct. 24, 1986.

Bruce P. Babbitt, Ferguson & Burdell, Seattle, and David B. Ruskin, Anchorage, for appellants R.J. Braunschweig and NGC Investment.*

Richard H. Foley, Jr., Wade & DeYoung, Anchorage, for appellee.

Before RABINOWITZ, C.J., BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

NGC Investment and Development, Inc., d/b/a Window Supply Co., three of its shareholders and its bonding company (hereafter referred to collectively as NGC) appeal from a superior court judgment awarding plaintiff Mortonson-Neal Joint Venture (M–N) $39,745 on M–N's action to enforce NGC's subcontract bid on glass, windows, and doors for a hospital in Homer. The court ruled that the doctrine of promissory estoppel required enforcement of NGC's bid. M–N was also awarded $15,000 in attorney's fees, an award which exceeded the Civil Rule 82(a) schedule and represented 80% of M–N's actual fees.

* Counsel on appeal was not counsel at trial.

NGC appeals from the underlying judgment, the personal judgment against one of its shareholders on his purported guarantee, the award of consequential damages for delay, several evidentiary rulings, and the award of attorney's fees. We affirm.

The events underlying the parties' dispute all occurred in 1983. On May 5, NGC phoned in a subcontract bid to provide windows, doors, glass, and aluminum storefront for M–N. NGC bid on four sections of the general contract for an addition to a Homer hospital. These four sections each stated that the "CONTRACT REQUIREMENTS of the General Conditions, the Supplementary Conditions and Division 1 apply to all work in this section." The general conditions specifically applied to all subcontracts and made the subcontractors directly accountable to the owner for any performance failures. Both the general conditions and the specific requirements of the four subcontract sections required warranties on parts and labor. The general conditions also required written approval of the architect before the owner would accept substitute products.

The owner awarded M–N the general contract late that afternoon. M–N promptly notified NGC that NGC was low bidder on the four subcontracts. M–N wanted to complete the project ahead of the architect's schedule. It needed the glass work completed before winter in order to enclose the building. Since designing and manufacturing windows takes considerable time, M–N asked NGC to start work immediately on the shop drawings. M–N also asked NGC to confirm its bid in writing. On May 19, NGC sent M–N its confirmation; NGC's form guaranteed that its work would meet contract specifications.

By the middle of June, M–N had received nothing from NGC since its bid confirmation. On June 14, M–N again telephoned NGC and asked it to submit its plans. NGC responded that it first needed either a notice to proceed or a contract from M–N. That afternoon, M–N sent out a letter to NGC specifically stating that NGC was low bidder and that M–N intended to employ NGC as subcontractor. The letter said, "This is notice that we would like you to proceed in an expeditious manner with the shop drawings required in your portion of the project."

Between the middle of June and the end of July, M–N and NGC communicated several times about the status of the shop drawings and the written subcontract. NGC finally sent M–N shop drawings for doors and storefront on July 29. The submitted drawings contemplated use of unapproved substitute supplies. On September 16, M–N notified NGC that the architect had rejected the drawings.

Throughout the summer, the parties had communicated regularly about problems with the shop drawings for the windows. The formal schedule agreed to in August required window installation by the end of November. Yet by September 13, NGC had submitted only a window manufacturer's catalog. Although NGC assured M–N as late as September 14 that it would expedite the window delays, it never sent M–N any window shop drawings.

Meanwhile, the parties were negotiating a final, written contract. In late July or early August, M–N sent NGC a form subcontract. That form required NGC to post a bond paid for by M–N at M–N's own expense. In addition to the bonding requirement, the written subcontract contained other matters "not addressed in the bid, bid confirmation letter of intent or project." These included provisions on delays, payments, indemnity, lien waivers, change orders, and termination takeover. On August 19, M–N received the subcontract signed but with the bonding requirement deleted. NGC did not want its limited bonding capacity tied up with such a small project. NGC did not object, however, to any of the other provisions.

M–N never signed the contract executed by NGC with the bond requirement deleted. Instead, it proposed that NGC's principal shareholders personally guarantee NGC's performance. The phone logs of an M–N manager indicate that NGC's accountant told him that each of NGC's principal own-

ers would personally sign the contract. The accountant, however, denied that she had reported the owners' agreement; rather, she testified that only one of them, R.J. Braunschweig, had agreed to guarantee NGC's performance. (George Crook, the named party in this action, and Lou Braunschweig are the other NGC owners). No one disputes that R.J. Braunschweig expressly told the M–N manager that he would guarantee NGC's performance.

On September 1, M–N sent NGC a revised contract, with the bond requirement deleted, but with space for the signatures of NGC's three principal shareholders: R.J. Braunschweig, his brother, Lou, and George Crook. Only R.J. Braunschweig signed in his capacity as an individual. Accompanying the executed subcontract, NGC submitted an addendum limiting its warranty on the storefront and proposing to substitute a different type of window. NGC signed this contract on September 20. M–N received it on September 22 but never signed it.

On September 20, M–N expressed its strong concern over NGC's delays. On September 21, just one day after signing the agreement, NGC repudiated it by letter. Prior to receiving the repudiation, however, M–N had telegrammed a warning to NGC of the consequences of further delay. On September 22, M–N sent an employee to meet with NGC. NGC did not meet with the M–N employee and did not inform him of its repudiation. On September 27, M–N's Homer office received the repudiation. Two days later, M–N wrote NGC to announce its search for a new subcontractor and to request NGC to mitigate damages. M–N then hired a substitute contractor at higher cost. Delays caused by the late substitution forced M–N to install temporary closures to protect the site from winter weather.

M–N sued NGC and its owners on November 8, 1983. M–N moved for summary judgment in September, 1984. The trial court ruled that one fact issue remained for trial: whether justice required enforcement of NGC's promise under the doctrine of promissory estoppel. To encourage settlement and avoid a trial on one narrow issue, the court noted its intent to award fees in excess of the Rule 82(a) schedule. After a four day trial before the court, Judge Shortell entered a judgment of $39,745 in M–N's favor. He found that NGC's defense lacked merit and bordered on bad faith. He awarded M–N $15,337.60 in attorney's fees, representing 80% of M–N's actual attorney's expenses. NGC then appealed.

## A. *NGC Estopped from Revoking its Bid*

In its final judgment, the superior court ruled:

17. The elements necessary for imposition of promissory estoppel have been proven. NGC made promises to Plaintiff which Defendants NGC and R.J. Braunschweig reasonably have expected to induce substantial action by Plaintiff. Plaintiff took action which amounted to a substantial change in its position in reliance on those promises. This action caused Plaintiff to be injured financially. The interests of justice require compensation of Plaintiff for the damage NGC caused.

This ruling is reversible only if the findings of fact supporting it are clearly erroneous. *State v. First National Bank of Ketchikan*, 629 P.2d 78, 82 n. 4 (Alaska 1981) (applying *Jamison v. Consolidated Utilities*, 576 P.2d 97, 102 (Alaska 1978)). A finding of fact is clearly erroneous if it leaves the reviewing court "with a definite and firm conviction on the entire record that a mistake has been made, even though there may be evidence to support the finding." *Martens v. Metzgar*, 591 P.2d 541, 544 (Alaska 1979) (footnote omitted). "Deference to the findings of the superior court is particularly appropriate when ... the bulk of the evidence at trial is oral testimony." *Id.* (footnote omitted).

Alaska follows the Restatement of Contract's formulation of promissory estoppel. *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1284 (Alaska 1985). Follow-

ing Corbin, we have reformulated Restatement Section 90(1) into a four part test:

1) The action induced amounts to a substantial change of position;

2) it was either actually foreseen or reasonably foreseeable by the promisor;

3) an actual promise was made and itself induced the action or forbearance in reliance thereon; and

4) enforcement is necessary in the interest of justice.

*Zeman,* 699 P.2d at 1284.

At trial, NGC admitted that the first three factors existed. It disputes only the fourth element: whether enforcement is necessary in the interest of justice. The necessity of enforcement presents a factual question. *Ketchikan,* 629 P.2d at 82 n. 4.

On appeal, NGC argues that M–N did not "rely on NGC's bid but instead continued to negotiate with NGC for the purpose of extracting a better bargain." NGC argues that M–N attempted to vary materially the terms of NGC's performance after accepting NGC's bid and claims that the written subcontract proffered by M–N contained many additional duties not described in the bidding documents. Citing *C.H. Leavell & Co. v. Grafe & Associates,* 90 Idaho 502, 414 P.2d 873 (1966), and *R.J. Daum Construction v. Child,* 247 P.2d 817 (Utah 1952), it argues that estoppel does not apply where the offeree does not unequivocally accept the offer.

Resolution of the parties' dispute requires an appreciation of the complexities of construction bidding. A general contractor's addition to the formal subcontract of terms not present in the bidding documents does not necessarily impose materially different duties. The bidding documents in this case did not purport to express completely the relationship between the general and its subcontractors. Rather, they described the respective duties assumed by the project owner and the general contractor and specifically required the general contractor to include certain provisions in any subcontract. The documents contemplated a contractual relationship between general and subcontractor distinct from the relationship between owner and general.

The bidding documents thus did not purport to be the exclusive agreement between general and subcontractor. Rather, they provided NGC with enough information to calculate its bid within the owner's requirements. The documents only outlined the duties owed by NGC to M–N and left the task of detailing the parties' respective obligations for a separate agreement. At the time NGC bid on its subcontract, it should have expected to be bound by reasonable additional terms governing standard conditions implicit in the relationship between subcontractor and general contractor. Both industry custom, as expressed in standard form subcontracts, and the circumstances surrounding the particular project, dictate the kinds of provisions NGC should reasonably have expected in its final subcontract.

NGC charges that M–N unreasonably imposed additional terms on it. First, NGC argues that M–N's written subcontract expanded the scope of NGC's performance beyond the duties reasonably assumable by NGC during bidding. The additional duties allegedly not mentioned in the bidding documents included provisions for:

(a) bonding;

(b) no damage for delay clause;

(c) payments;

(d) indemnity;

(e) lien waivers;

(f) notice and change order procedures including the duty to continue work despite not agreeing on a change or price;

(g) termination takeover....

Second, NGC claims that M–N accelerated the time for NGC's performance from two years to one. Third, NGC claims that M–N demanded "personal guarantees not required in the original agreement." NGC concludes that "[t]here can be no estoppel where, as here, the promisors' offer was not been [sic] accepted."

At trial, the parties introduced conflicting testimony about their bidding expectations and the course of their contract and

performance negotiations. Judge Shortell "concluded that much of [NGC's] evidence was not credible." On appeal, we defer to his ability to observe the witnesses' demeanor and resolve doubts in favor of M–N. *See Curran v. Hastreiter,* 579 P.2d 524, 527 (Alaska 1978). We can more readily analyze NGC's claims by considering the bond and personal guarantees as a single dispute. Thus, NGC's claims involve: 1) the performance guarantees; 2) the performance schedule; and 3) other alleged additional subcontract obligations.

### 1. *The Performance Guarantee*

■ The parties dispute whether M–N asked NGC to bond its work when recording NGC's phone bid. An M–N manager testified that an M–N employee asked NGC if it would bond its work at the time of the phone bid.[1] M–N asserts that NGC agreed to supply a bond.[2] NGC, however, argues that it merely stated it *could* bond the project; it claims, however, that it *would* only have bonded such a small project for a higher premium from M–N.

Judge Shortell made no specific finding about the bond discussion during the bidding. The evidence on both sides conflicts and relies on inferences from company policy. M–N testified that it routinely asked potential subcontractors if they would bond the project; a "yes" on the bid checklist marked next to "bondable" meant that the subcontractor had agreed. However, no M–N employee testified from personal knowledge either that the M–N employee had communicated the policy or that NGC had agreed. For its part, NGC claimed that it routinely refused to include bonds in its bids. None of its employees, however, testified from personal knowledge of the conversation with the M–N employee.

In our balancing of conflicting company policies, NGC's lack of credibility requires resolution of the doubt against its version.

Thus, the bond requirement represented not an unreasonably imposed additional duty but rather a duty assumed by NGC at the time of bidding. M–N's later attempt to get personal guarantees from NGC's shareholders represents not an additional demand but rather an acceptance of a substitute for an obligation already assumed by NGC.

### 2. *The Performance Schedule*

■ NGC's claimed accelerated performance obligations fail for lack of specificity and credibility. The bidding documents projected a two year construction deadline for completion of the hospital addition. NGC points to nothing in the record demonstrating the time for window installation required by the bidding documents. At trial, R.J. Braunschweig testified that he had prepared his bid on the basis of the two year project schedule but did not indicate when he expected NGC's performance to be due under that schedule. Indeed, he had earlier stated in an affidavit that NGC had prepared its bid *on the assumption of* a November 1983 completion date.

M–N testified that the architect's deadline represented the final permissible date for all construction to finish. Contractors customarily attempt completion before the deadline to maximize profits by freeing their resources for other projects. At the time of bidding, NGC should have expected to perform at a reasonable time within the two year schedule.

In any event, from the time M–N first notified NGC of the award, NGC knew that M–N needed the glass and windows installed before the onset of that year's winter. NGC did not object when it confirmed its bid in writing and never objected to the timetable until its letter of repudiation in September. The record does *not* support a view that a November 1983 window installation was an unreasonable demand within

---

**1.** Although the employee later testified at trial, no one asked him about his receipt of the bid. The manager based his testimony on the bid record. The bid record summarizes in checklist form the information requested of each bidder.

**2.** The bid record indicates that NGC was "bondable." The M–N manager testified that "bondable" meant that the subcontractor had agreed to bond its work on that project.

this schedule. NGC's failure to object to M–N's timetable until two months before completion was due seriously weakens its claim that the timetable materially altered NGC's performance obligations. In short, although Judge Shortell made no express finding as to NGC's bid expectations, the record does not support NGC's claim of accelerated obligations.

### 3. Other Alleged Additional Subcontract Obligations

■ The remaining entries in the litany of additional obligations allegedly imposed by M–N's form subcontract similarly fail to establish that M–N unreasonably added to NGC's duties. These terms covered issues which can be implied from industry custom or left open for further negotiations. Their mere inclusion in the subcontract does not demonstrate that M–N imposed duties on NGC materially different from those NGC should have known would apply. M–N sent NGC its standard subcontract. The record contains no evidence that NGC objected to any of the terms of payment, indemnity, change order procedures, etc. Indeed, NGC twice readily signed the subcontract, striking out only the bonding requirement of the first draft and altering product specifications and warranties in the second draft. These other terms can hardly be deemed "material additions" to the contract when NGC apparently did not consider them consequential at the time.

NGC has defended this action by accusing M–N of "bid shopping," implying that M–N forced an unwilling NGC to accept additional terms or lose the contract. We could not condone such a practice. Here, however, the record demonstrates that during the summer-long contract negotiations, NGC seriously disputed only the bonding requirement. M–N allowed NGC to substitute personal guarantees for the bond. As the deadline for starting work approached, NGC unilaterally limited warranties on products in contravention of the bidding documents. One day after executing the subcontract, NGC unilaterally revoked it. A subcontractor cannot string along the general until the time for performance nears and then suddenly limit its promised performance.[3] Such conduct forces the general to accept a substitute performance or face delays in finding a substitute subcontractor.

■ NGC relies on two cases in which courts have refused to apply the doctrine of promissory estoppel in the area of construction bidding. C.H. Leavell & Co., 414 P.2d 873; R.J. Daum Construction, 247 P.2d 817. They are distinguishable from the instant situation because the general contractors in each attempted to expand the scope of the duties required of the subcontractor. Here, no such expansion occurred. The record does not support NGC's claim that M–N materially altered the conditions reasonably assumable by NGC when bidding. When M–N notified NGC in writing to proceed, it unequivocally accepted NGC's bid. At that point, the parties had a contract with terms covering the details of their agreement left open. The mere addition of terms to the proposed final contract does not establish a material alteration of NGC's promises. On this record, the additional terms are not material.

In *Alaska Bussell Electric v. Vern Hickel Construction*, 688 P.2d 576 (Alaska 1984), we estopped a subcontractor from revoking its bid prior to the general contractor's acceptance. We accepted the view that the general's incorporation of the subcontractor's bid into the general bid constituted justifiable reliance sufficient to enforce the subcontractor's promise. *Id.* at 588. This case presents stronger reasons for enforcement of the subcontractor's promise than did *Alaska Bussell*. M–N demonstrated its reliance not only by incorporating NGC's bid but also by relying on the bid during summer-long negotiations with NGC for a final contract. Moreover, as noted above, M–N expressly accepted NGC's bid before NGC withdrew it.

---

**3.** Indeed, NGC had intended from the time of bidding to use substitute products despite the requirement that the architect approve any such substitutes.

■ The trial court's equitable enforcement of NGC's bid was not clearly erroneous. The interests of justice necessitated enforcement. *See Zeman,* 699 P.2d at 1284. M–N relied not only on the original bid, but on four months of repeated assurances of performance and lack of objections by NGC. By its own words and conduct, NGC obligated itself to perform. NGC is, therefore, estopped to deny M–N's entitlement to compensation for damages incurred due to its reasonable reliance on NGC's promise.

### B. *R.J. Braunschweig Personally Guaranteed Performance*

The trial court ruled that:

In September, Defendant R.J. Braunschweig, a shareholder and director of NGC, agreed to co-sign the subcontract with NGC in lieu of furnishing the bond.

. . . .

The elements of a contract, and its breach, have also been demonstrated, with regard to plaintiff's claim against R.J. Braunschweig. Defendant R.J. Braunschweig is contractually bound to guarantee the performance of NGC of its promise.

NGC argues that R.J. Braunschweig did not guarantee NGC's performance. It makes two claims. First, it argues that Braunschweig cannot be held to have guaranteed an agreement based not on contract but rather on estoppel law. Second, it claims that M–N never accepted Braunschweig's limited guarantee.

Courts construe guarantees under traditional contract principles.

"A guaranty is a contract between two or more persons, founded upon consideration, by which one person promises to answer to another for the debt, default or miscarriage of a third person, and, in a legal sense, has relation to some other contract or obligation with reference to which it is a collateral undertaking." Like any other contract, its formation is governed by principles of mutual assent, adequate consideration, definiteness and a meeting of the minds (38 C.J.S. Guaranty § 8, p. 1143).

*Timi v. Prescott State Bank,* 220 Kan. 377, 553 P.2d 315, 324 (1976) (quoting *Trego WaKeeney State Bank v. Maier,* 214 Kan. 169, 519 P.2d 743 (1974) (other citations omitted).

■ Braunschweig's claim that a guarantee requires a valid underlying contract relies on too literal an interpretation of the relevant authorities. Under *Timi,* a guarantor is liable on the underlying "debt, default, or miscarriage" of the primary obligor; the guarantee relates to "some other contract *or obligation.*" 553 P.2d at 324 (emphasis added). Herein we have affirmed the superior court's view that the promise to perform guaranteed by Braunschweig was an obligation enforceable under the doctrine of promissory estoppel. To hold that Braunschweig escapes liability on the guarantee because that obligation was enforced under principles of estoppel rather than contract law would thwart the parties' original intent in negotiating the guarantee. Moreover, in *Alaska Bussell* we adopted the view of promissory estoppel expressed by the California Supreme Court in *Drennan v. Star Paving,* 51 Cal.2d 409, 333 P.2d 757 (1958), and therein noted that court's analogy of subcontractor's bids to option contracts. 688 P.2d at 580. We then added: "[I]f a contractor is to deliver a set price to an owner, these bids must be binding for a reasonable time.... Promissory estoppel, as applied in *Drennan* and adopted by this court, is a necessary element of this scheme." *Id.* Application of promissory estoppel in this case thus effectively results in an option contract. We are aware of no authority suggesting that an option contract cannot be guaranteed. Therefore, the superior court's application of estoppel rather than contract principles to the underlying NGC promise does not bar enforcement of the guarantee.

Braunschweig also claims that his promise was a counteroffer that M–N never accepted. This court must, however, view the evidence in the light most favorable to

M–N. *See Curran*, 579 P.2d at 527. Here, the record demonstrates an offer by R.J. Braunschweig accepted by M–N for valid consideration.

■ Both M–N and NGC agree that M–N was the offeree with respect to Braunschweig's guarantee. M–N's acceptance could only have occurred after his oral promise of September 1; M–N claims to have accepted his guarantee by ordering NGC to perform in a September 23 telegram. The telegram cannot constitute M–N's acceptance because it impliedly rejected NGC's qualifications of the product specifications and warranties; an acceptance must be in exact compliance with the terms of the offer. *Thrift Shop v. Alaska Mutual Savings Bank*, 398 P.2d 657 (Alaska 1965). *See also Hall v. Add-Ventures*, 695 P.2d 1081, 1087 n. 9 (Alaska 1985). M–N claims that it was unable under the general contract to accept NGC's modification and therefore it did not materially modify Braunschweig's guarantee. This claim is meritless.

■ Nonetheless, we find that M–N did accept Braunschweig's offer. After Braunschweig's promise, M–N sent NGC the revised contract with the bond provision deleted and space for his individual signature added. M–N's assent to the contract may reasonably be inferred from this act. *See Howarth v. First National Bank of Anchorage*, 596 P.2d 1164 (Alaska 1979) (assent may be based on reasonable meaning of party's acts). By sending the revised contract, M–N accepted Braunschweig's offer.

### C. *The Trial Court Did Not Err by Awarding M–N Damages for Delay*

■ NGC argues that the trial court should not have awarded M–N damages for delay but only liquidated damages because the "general conditions" of the contract between M–N and the owner limited M–N's liability for delay to liquidated damages payable to the owner. M–N claims that the liquidated damages clause did not apply to subcontractors. NGC claims that this provision should "flow down" to the subcontract and similarly limit NGC's liability for delay.

We need not reach this question because NGC did not raise it at trial. Points not raised at trial are not subject to appellate review. *Williams v. Alyeska Pipeline Service Co.*, 650 P.2d 343, 351 (Alaska 1982).

### D. *The Trial Court Did Not Err by Admitting Certain Documents and Testimony*

■ Over NGC's objections, the trial court admitted four telephone conversation logs as business record exceptions to the hearsay rule. These four logs documented calls made by an M–N employee who did not testify at trial. The court ruled that these "[m]emos were made at—on or about the time of the communication and kept in the regular course of business...."

Also over NGC's objection, the court admitted an M–N manager's testimony which contradicted part of NGC's explanation for its delay in preparing shop drawings. The court admitted this testimony "simply to show that the manager investigated the statements made by [NGC] and came to the conclusion that they were not—[NGC] was not telling him the truth about their relationship with these other companies." That is, the court did not admit the testimony for the purpose of proving the truth of the statements; it limited its admissibility to prove the manager's state of mind.

We express no opinion on the admissibility of such documents and testimony. Rather, on the record before us, we believe any possible error was harmless. The four admitted documents in question were cumulative evidence of M–N's reliance. Moreover, the admission of the testimony could have helped NGC in that the reasonableness of M–N's *continued* reliance on NGC becomes suspect once M–N became aware that NGC was either mistaken or lying.

Apart from the admitted testimony the record contains ample evidence of both NGC's problems with its suppliers and M–

N's patience with NGC's delays. M–N's conduct demonstrates that the testimony did not prejudice M–N's own attitude toward NGC. The conversations demonstrate M–N's continued good faith efforts to allow NGC to perform. At worst, the admitted testimony was merely cumulative evidence of NGC's lack of credibility. We find no prejudice.

### E. The Trial Court Properly Awarded Attorney's Fees In Excess of the Civil Rule 82 Schedule

 Judge Shortell awarded M–N $15,-337.60 in attorney's fees. This represented 80% of M–N's actual attorney's fees. NGC argues that the absence of bad faith from the record makes the award an abuse of discretion.

Rule 82 grants the trial court discretion to award attorney's fees in an amount exceeding the rule's schedule. Alaska R.Civ.P. 82(a). We will only reverse when the judge has abused his discretion. *Malvo v. J.C. Penney Co.*, 512 P.2d 575, 587 (Alaska 1973). "An abuse of discretion is established where it appears that the trial court's determination as to attorney's fees was manifestly unreasonable." *Id.* (quoting *Palfy v. Rice*, 473 P.2d 606, 613 (Alaska 1970)).

In *Hausam v. Wodrich*, 574 P.2d 805, 811 (Alaska 1978), we upheld an award of 86% of the actual attorney's fees expended by the prevailing party. That case involved no improper conduct by the losing party. In *State v. University of Alaska*, 624 P.2d 807, 818 (Alaska 1981), we stated that an award of over 90% of actual fees is excessive absent evidence that the losing party's claim was "frivolous, vexatious or devoid of good faith."

In awarding 80% of its actual fees to M–N in this case, the superior court found in part:

5. Defendants insisted on litigating a *weak* and *incredible* defense to its highly predictable conclusion. Their *intransigence* has caused plaintiff justifiably to expend considerable effort on motions and trial practice. I accept plaintiff's

characterization of this defense as *"border[ing] on bad faith."*

(Emphasis added). Here the superior court was in the best position to evaluate the defendants' demeanor and credibility. We, therefore, defer to the court's view as expressed in the quoted finding. In light of the foregoing authorities, the defendants' poor conduct tends to support an award of attorney's fees that might otherwise be excessive. We will not call the 80% award in this case "manifestly unreasonable."

We, therefore, AFFIRM the superior court's ruling in all respects.