**CTI INTERNATIONAL, INC., Plaintiff and Counter-Defendant, Appellant,**

v.

**LLOYDS UNDERWRITERS and British Companies, et al., Defendants and Counter-Plaintiffs, Appellees.**

No. 471, Docket 83–7607.

United States Court of Appeals, Second Circuit.

Argued Jan. 6, 1984.

Decided May 16, 1984.

Pamela J. White, New York City (Kieron F. Quinn, Ober, Kaler, Grimes & Shriver, New York City, on brief), for plaintiff and counter-defendant, appellant.

Leonard S. Leaman, New York City (Lord, Day & Lord, New York City, on brief), for defendants and counter-plaintiffs, appellees.

Before KAUFMAN, NEWMAN, and PRATT, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

CTI International, Inc. ("CTI"), plaintiff-appellant, appeals from the June 21, 1983, judgment of the District Court for the Southern District of New York (Robert J.

Ward, Judge) entered following a bench trial, awarding defendants-appellees $363,-597.57, plus prejudgment interest, on a counterclaim. The issues on appeal concern the District Court's rejection of plaintiff's claim for damages based on lost rental income and its alternative claim for damages for loss of use of rental property; both claims were advanced as an offset to the counterclaim. Finding no error in the District Court's award of damages, we affirm the judgment.

### Facts

CTI, a Delaware corporation with its principal place of business in New York, is the world's largest lessor of cargo containers. CTI maintains container depots worldwide and regularly "repositions" containers from areas of excess supply to areas of high market demand.

Defendants-appellees are a group of unincorporated syndicates and American, British, and other foreign corporations engaged in the business of insurance (collectively "Lloyds"). Effective January 1, 1980, CTI and Lloyds entered into an insurance contract for "all-risk" coverage, specifically including "all repositionings" of CTI's containers located worldwide. The insurance policy covered "new" containers (less than one year old) at full replacement cost. Older containers were insured for book value. In the event of a covered loss Lloyds acquired subrogation rights against third-party wrongdoers.

Shortly after the effective date of the policy, CTI contracted with Ramsay Scarlett & Co. Inc. ("Ramsay") to reposition approximately 1,000 containers from Panama to the Gulf Coast in order to reduce excess inventories accumulated at the port of Coco Solo, Panama, and to satisfy market demand in New Orleans and Houston. Ramsay chartered the tug SEASPAN ROYAL and the barge GENMAR 106, both owned by Seaspan International, Ltd. ("Seaspan"), to accomplish the carriage.

On February 7, 1980, the GENMAR 106, with 1,007 containers on board, left Panama for New Orleans. Within hours of its departure an accident occurred, resulting in the loss of approximately half of CTI's containers and severe damage to most of the remainder. CTI made a claim under the Lloyds policy and also filed an admiralty action against Ramsay and Seaspan in the District Court for the District of Maryland seeking damages of $2.4 million. CTI sued to recover for both its insured losses—loss of and damage to the containers—and its uninsured losses—the unreimbursed portion of the cost of replacing old containers, administrative expenses, and, especially pertinent to this appeal, lost rental income. Lloyds did not intervene in the Maryland litigation.

In November 1980, Lloyds paid CTI $1,135,994.38, representing the insured value (less a $5,000 deductible) of the containers lost overboard as a result of the GENMAR 106 accident. Subsequently, Lloyds made an additional payment of $79,420.08 for claims asserted under the policy for damage to CTI's "new" containers. In December 1981, the Maryland litigation between CTI and Ramsay and Seaspan was settled upon CTI's receipt of $600,000 and the exchange of mutual releases. When advised of the settlement, Lloyds demanded to be paid, pursuant to its subrogation rights, the entire settlement amount and ceased processing CTI's remaining claims under the policy. This litigation ensued.

In early 1982, CTI sued Lloyds in the District Court for the Southern District of New York seeking to recover $600,000 for loss of and damage to insured cargo containers suffered in several "repositionings," including an additional claim for damage to "old" containers as a result of the GENMAR 106 accident. Lloyds counterclaimed, demanding recovery, as subrogee, of the $600,000 CTI had obtained in settlement of the Maryland litigation. On the eve of trial the parties settled all issues raised by CTI's claims; Lloyds paid CTI $82,000 for damage to the GENMAR 106 "old" containers. In May 1983, Lloyds' counterclaim proceeded to trial before Judge Ward.

The District Judge determined that under New York law, which the parties

agreed governs Lloyds' counterclaim, Lloyds was entitled to recover on its subrogation claim the amount by which CTI's recovery in the Maryland settlement exceeded CTI's uninsured losses.[1] The Court found that, as a result of the GENMAR 106 accident, CTI had suffered losses not covered by the Lloyds policy in the amount of $236,402.43. Judge Ward rejected as "not proven" CTI's additional claims of uninsured losses—(i) excess of replacement cost of lost "old" containers over and above their insured book value, and (ii) lost rental income resulting from the loss of use of the damaged and destroyed containers. Deducting CTI's uninsured losses from its recovery in the Maryland litigation, the District Court entered judgment in favor of Lloyds on its subrogation claim for the difference, $363,597.57, plus prejudgment interest, from the date of the Maryland litigation.[2]

The contested issues have narrowed on appeal. CTI primarily challenges the trial court's determination that it suffered no damages attributable to lost rental income as a result of the GENMAR 106 accident.[3] More specifically, CTI asserts that under the applicable legal standards it proved the fact of lost rental income with reasonable certainty and sufficiently quantified the amount of the resulting damages. Alternatively, CTI claims that, even if it has not established a recoverable amount of rental income actually lost, it is nonetheless entitled to recover the rental value of its containers as damages for loss of their use. These additional uninsured damages, CTI contends, should increase its share of the Maryland settlement and correspondingly reduce Lloyd's subrogation share.

## Discussion

1. The applicable legal framework for consideration of the lost rental income claim is not in dispute. The parties are agreed, and the District Court held, that New York law governs this case and consequently that Lloyds is entitled to recover against CTI a portion of the third-party settlement recovery "only if CTI had received more [from the Maryland settlement and the insurance proceeds] than the total amount of its actual loss." Conclusions of Law, ¶ 5, citing *Aetna Insurance Co. v. United Fruit Co.*, 304 U.S. 430, 438, 58 S.Ct. 959, 962, 82 L.Ed. 1443 (1938); *Sun Insurance Office v. Hohenstein*, 128 Misc. 870, 220 N.Y.S. 386, 389 (1937). Nor is there disagreement that CTI needed to prove with reasonable certainty only the fact of damages and was entitled to calculate the amount of damages on any rational basis, see *Bigelow v. R.K.O. Radio Pictures*, 327 U.S. 251, 263–65, 66 S.Ct. 574, 579–80, 90 L.Ed. 652 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); see also *Lee v. Joseph E.*

1. The District Court stated the general principle to be that the subrogation claim extended to CTI's total recovery (Maryland settlement plus insurance proceeds) less CTI's actual losses. Since in this case CTI received from Lloyds full payment for all of its insured losses, that payment drops out of the equation, leaving Lloyds entitled to the Maryland settlement less CTI's uninsured losses.

2. Since Lloyds' subrogation rights "matured" only when CTI received the settlement proceeds of the Maryland litigation, the District Court awarded Lloyds prejudgment interest only from the settlement date of the Maryland litigation, December 1, 1981, to date of payment.

3. CTI also argued to the trial court and pursues on appeal a contention that it was not fully reimbursed for the replacement cost of its "old" containers. While its "new" containers (one year old) were insured to full replacement value, older containers were insured only for book value. Since CTI replaced all of the lost "old" containers with new unused containers, its replacement cost exceeded Lloyds' reimbursement by $75,000. CTI asserts this difference is a loss, maintaining that it received no benefit from the rejuvenation of its fleet since all containers are "fungible" and serve their purpose regardless of age. Lloyds countered, and the trial court found, that "book value" reimbursement fully compensated CTI's loss, at least absent evidence that the market value of "older" containers exceeds their "book value." We are not persuaded to disturb Judge Ward's conclusion. CTI's failure to introduce evidence of the market value of the "older" containers and its concession that containers have a limited useful life, twenty years, and therefore suffer real economic depreciation is fatal to its claim.

*Seagram & Sons, Inc.,* 552 F.2d 447, 456 (2d Cir.1977) (applying New York law). What CTI disputes is the trial court's determination that it did not suffer any lost rental income.

■ Lloyds' evidence corroborated its claim that CTI did not incur any lost rental income as a result of the GENMAR 106 accidents. Lloyds established that throughout 1980 CTI's inventory of available containers in both Houston and New Orleans was never depleted. Indeed, in the months following the accident, CTI's containers available for rental in each city never totaled less than 38 and 25, respectively. Lloyds also argued that CTI's failure to reposition additional unrented containers from other ports to the Gulf Coast area immediately after the accident or to accelerate repair of a significant number of damaged containers in the Gulf area casts doubt on CTI's contention that it lost rental income due to a shortage of containers. Finally, Lloyds elicited CTI's admission that it could not identify specific customers who were unable to lease containers in the Gulf Coast area as a result of the accident.

In response, CTI tendered evidence to support its contention that the U.S. Gulf Coast ports had customers for any units that CTI had available for rental. CTI established and the District Court found that (i) CTI ordinarily "repositions" containers from areas of excess supply to areas of market demand and insufficient equipment supply; (ii) during 1980 worldwide market demand for containers was "tight," with worldwide fleet utilization rising from 81% to 84%; and (iii) the GENMAR 106 reposition was prompted by "insufficient container inventories" at Houston and New Orleans. CTI's witnesses further testified that the inventory levels at both ports in the month following the accident were significantly below the minimum level required to service its customers and that CTI consequently lost rental income as a result of the accident. Indeed, CTI suggests that but for the anticipated rental income it would not have invested over half a million dollars to reposition the 1,007 containers. This evidence, CTI maintains, proved, with reasonable certainty, that it would have derived rental income from leasing the GENMAR containers.

CTI estimated lost profits of $297,518. Since CTI claimed it had no variable rental costs, it claimed the full amount of lost rental income as lost profits. CTI's rental charge has two components: (1) a variable, per diem rate, and (2) a fixed, per rental pickup charge designed to reflect the market demand for containers at the origin and destination markets. Assuming that all the GENMAR containers would have been rented had they been available, CTI estimated it lost, at the very least, $231,763 in per diem charges—$2.36, its lowest per diem charge, for the period of time the containers were unavailable, which it assumed averaged 75 days for damaged containers and 120 days for lost containers. In addition, CTI estimated that it lost a minimum of $65,775 in fixed, per-rental charges, composed primarily of a $125 charge imposed for New Orleans pickup on the 504 lost containers.

After reviewing the evidence, Judge Ward, acting as fact-finder, concluded that "the alleged damages relating to ... [fixed] charges and lost profits have not been proven. There was at all times an inventory of available containers in New Orleans and Houston and no credible evidence of lost sales." These findings were adequately supported by the record and are not in error. The District Court was entitled to rely on the availability of inventory throughout the post-accident period, and, contrary to CTI's contention, also properly relied on CTI's inability to identify specific lost sales in support of the finding that the fact of lost profits had not been established. While a plaintiff seeking to prove the fact of lost profits is not required to present evidence of lost sales, the defendant's evidence that no sales were lost is nonetheless probative. CTI strives to avoid having to persuade us that Judge Ward's finding of no lost rental income was clearly erroneous by claiming that the Judge, applying too strict a standard,

found wanting CTI's evidence of the *amount* of lost rental income. We are satisfied, however, that the Judge, mindful of the proper standards, determined that CTI had failed to prove the *fact* of lost rental income.[4]

2. Appellant's more significant contention, not squarely presented to the trial judge, invokes this Court's opinion in *KLM, Inc. v. United Technologies Corp.*, 610 F.2d 1052, 1056–57 (2d Cir.1979), in support of a claim that under New York law CTI is entitled to recover "loss of use" damages based on the rental value of the containers, irrespective of whether it suffered actual financial loss, *i.e.*, lost anticipated rental income, or whether it "was able to completely cover its loss by using other" containers. *Id.* at 1057. In *KLM*, a DC–8 aircraft leased by the airline experienced an engine explosion and was disabled for 42 days. KLM's products liability action advanced two damage theories: (i) actual financial loss and (ii) loss of use damages based on the rental value of a substitute aircraft. The District Court first rejected as unpersuasive the airline's claim of financial loss. The District Court also turned down KLM's claim for loss of use damages. Relying on Justice Cardozo's opinion in *Brooklyn Eastern District Terminal v. United States*, 287 U.S. 170, 175, 53 S.Ct. 103, 104, 77 L.Ed. 240 (1932), the trial court ruled that a commercial entity like KLM could not recoup the rental value of a replacement vehicle absent proof that KLM had hired a substitute aircraft or incurred financial loss as a result of not hiring one.

This Court reversed. Judge Gurfein observed that under New York and Connecticut law loss of use is compensable "regardless of whether there is any proof of financial loss" or of a substitute rental. *Id.* at 1055–56. He applied this rule, noting that to condition recovery on proof of loss would be inconsistent with the theory underlying the allowance for loss of use: impairment of the right to use, not prevention of actual use, warrants compensation. The *KLM* decision distinguished *Brooklyn Eastern District Terminal v. United States, supra,* an admiralty decision in which the Supreme Court denied loss of use damages for a disabled tugboat, because "concrete evidence" had established that the tugboat owner was "able completely to negate any financial loss by working his other two tugboats overtime" to tow "the same number of car-floats as before."[5] *KLM, Inc. v. United Technologies Corp., supra,* 610 F.2d at 1057. Noting the uncertainty as to whether the plaintiff was able to carry as many passengers without the damaged aircraft and the difficulty of making the determination on the "complex" facts of the *KLM* case, Judge Gurfein was unwilling to require the plaintiff "to show that he was *not* able to cover his loss." *Id.* (emphasis in original). The potential passenger traffic was viewed as more open-ended than the number of carfloats requiring towing in *Brooklyn Terminal.*

If we had no further guidance from the New York courts, we would find it a close question whether this case would be gov-

---

**4.** CTI's reliance on *Interpool, Ltd. v. Universal Maritime Service Corp.*, 1983 A.M.C. 1082 (N.J. Super.Ct.App.Div.1982), is unavailing. In *Interpool* a container lessor successfully recovered revenue lost with respect to containers improperly detained without offering proof of specific lost sales. While Interpool's proof parallels CTI's submissions in most respects, the difference is not insignificant—Interpool introduced evidence that demand during the period of detention exceeded the availability of containers.

**5.** In admiralty demurrage, the loss of profits or the loss of the use of a vessel pending repairs or other detention, is not an allowable item of damage absent reasonable certainty of a pecuniary loss. "In all the cases in which we have allowed demurrage the vessel has been engaged, or was capable of being engaged, in profitable commerce." *The Conqueror*, 166 U.S. 110, 125, 17 S.Ct. 510, 516, 41 L.Ed. 937 (1897) (denying demurrage for a pleasure boat). *See also Compania Pelineon de Navegacion v. Texas Petroleum Co.*, 540 F.2d 53 (2d Cir.1976) (demurrage only allowed if profits actually have been or reasonably supposed to have been lost). In *Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401 (5th Cir.1982), the Court found error in a loss of use award that assumed a detained ship would have been hired 100% of the time when the historical evidence established only a 77.2% usage rate.

erned by *Brooklyn Terminal* or *KLM.* The potential market for containers is not as fixed as the car-floats in *Brooklyn Terminal* though not as open-ended as the passenger traffic in *KLM.* And the evidence here negates financial loss more clearly than in *KLM* though perhaps not as conclusively as in *Brooklyn Terminal.* However, we need not choose between these federal precedents because the development of New York law since *KLM* points decisively to a rejection of loss of use damages in this case. In 1979 Judge Gurfein noted that New York "does not require a showing of financial loss in order to recover loss of use damages" and further asserted that "there is no reason to suspect that ... New York would disallow such damages even if it were shown that appellant was able to completely cover its loss by using other jets." *Id.* We now have recent guidance that undermines this last assertion.

In 1980 the *New York Supplement* published the opinion of the trial court in *Mountain View Coach Lines, Inc. v. Hartnett*, 99 Misc.2d 271, 415 N.Y.S.2d 918 (N.Y.Sup.Ct.), *aff'd*, 69 A.D.2d 1020, 414 N.Y.S.2d 947 (3d Dep't 1979) (table), *modified on other grounds*, 70 A.D.2d 977 (1979). In that case a bus operator was denied recovery for loss of use damages upon evidence that no replacement vehicle for his damaged bus was hired and that the bus operator had extra buses not in use during the period the damaged bus was unusable. Loss of use damages were denied because the evidence showed the absence of financial loss. Such evidence defeated the same operator's claim for loss of use damages in another case two years later. *Mountain View Coach Lines, Inc. v. Gehr*, 80 A.D.2d 949, 439 N.Y.S.2d 632 (3d Dep't 1981). *See generally* 18 A.L.R.2d 497, 524, 528–36 (1968).

▆▆▆ These decisions make clear, contrary to what *KLM* anticipated, that New York law does not establish a conclusive presumption of entitlement to damages every time an owner of commercial property has been prevented from devoting that property to beneficial use. At most, the loss of use doctrine means only that a showing of actual financial loss is not an element of the property owner's prima facie case; in the absence of evidence from either side as to actual financial loss attributable to deprivation of use of the property, the owner may recover compensation for loss of use. But, as the *Mountain View Coach Lines* decisions implicitly indicate, whatever presumption might ordinarily entitle an owner to loss of use damages disappears when a defendant presents probative evidence tending to negate the existence of any actual financial loss; at that point the plaintiff must persuade the trier that deprivation of use of the property resulted in financial loss. In the *Mountain View* cases the defendants' evidence dispelled any presumption of compensable loss of use, and the plaintiff's evidence failed to establish actual financial loss. That is exactly what occurred in this case. Since CTI did not rebut Lloyd's evidence to the fact-finder's satisfaction, the trial court properly denied any damages for loss of use.

The judgment of the District Court is affirmed.