*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MICHAEL J. KEENAN and DOLORES A. KEENAN, | ) ) ) | Supreme Court No. S-16176 |
| Appellants, | ) ) | Superior Court No. 3AN-12-08714 CI |
| v. | ) ) | O P I N I O N |
| JACKSON MEYER and KANDICE MEYER, | ) ) ) ) | No. 7259 – July 20, 2018 |
| Appellees. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Katherine Demarest, Dorsey & Whitney LLP, Anchorage, and Jeffrey M. Feldman, Summit Law Group, Seattle, Washington, for Appellants. Thomas P. Amodio, Debra J. Fitzgerald, and Robert W. Corbisier, Reeves Amodio, LLC, Anchorage, for Appellees.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.

## I.    INTRODUCTION

Landowners sued their neighbors over use of a well and an access easement, and the neighbors counterclaimed for damages caused by interference with their water rights and loss of access to their cabin. The superior court ruled in favor of

the neighbors following trial and awarded them compensatory loss-of-use damages, as well as full attorney's fees based in part on a finding that the landowners had engaged in vexatious and bad faith conduct. The landowners appeal. We conclude that the superior court did not clearly err in the findings underlying its damages award and that it did not abuse its discretion in its award of full attorney's fees to the neighbors. We therefore affirm the judgment.

## II. FACTS AND PROCEEDINGS

### A. Keenan And Wade Subdivide Their MacDonald Spit Property.

Michael Keenan and Hugh Wade co-owned about five acres of property near Seldovia at the base of MacDonald Spit.[1] The property is unique in the Spit community because its access routes do not cross any beaches and can be used by highway-legal vehicles. Motorized access to other properties on the Spit is primarily limited to all-terrain vehicles (ATVs).

In 1993 Keenan and Wade subdivided the property into three lots, Lots 1, 2, and 3, and sold Lots 1 and 2, retaining joint ownership of Lot 3. The subdivision plat called for a public access easement along the southern border of all three lots. As part of the sale of Lot 1, Keenan and Wade executed a written memorandum agreement with the new owners, committing to build a year-round ATV and pedestrian trail within the public access easement and to allow a water well to be drilled near the easement; the subdivided lots would "share equally in the right to the water." Keenan testified that he intentionally failed to have the memorandum agreement notarized, believing that it could not then be recorded and he would not be bound by it. The Lot 1 owners recorded it anyway.

---

[1] Appended to this opinion is one of the maps used by the superior court to explain the case's background.

A trail known as the Beach Access Trail was constructed along the public access easement, deviating from the easement at one point in Lot 3 to get around an impassable rocky bluff. Subdivision residents and other property owners and lessees in the area customarily used the Beach Access Trail, usually by ATV or foot, despite its deviation from the public easement.

During this time Keenan and Wade reached Lot 3 by taking the western portion of the Beach Access Trail to where it forked into another trail — the Southern Original Trail — that cut across the southeastern corner of Lot 2. After the Lot 2 owners constructed a gravel pad in the corner of their lot, Keenan and Wade crossed the gravel pad before entering Lot 3 via the remnant of the Southern Original Trail, which became known as Jerry's Trail. The Lot 2 owners also used Jerry's Trail to reach their house.

B.     **Keenan And Wade Subdivide Lot 3.**

In 1995 Michael Keenan and his wife Dolores built a second house on the southern portion of Lot 3, accessible by highway-legal vehicles via the Beach Access Trail. By 1999 Keenan and Wade had entered into a de facto partition of Lot 3,[2] which Keenan sought to formalize in 2004.[3] Wade was named the owner of the northern part, Lot 3A-1, and Keenan was named the owner of the southern part, Lot 3A-2.[4] A 2006 court order recognized that Keenan and Wade had agreed to reciprocal easements and directed the parties to file "any necessary documents to preserve said easements, and access to water." In 2008, presumably in order to comply with the court order, Wade granted Keenan a view easement, and Keenan granted Wade water rights and an access easement. The water rights agreement purported to grant Wade rights to water from the

---

[2]     *See Keenan v. Wade*, 182 P.3d 1099, 1102 (Alaska 2008).

[3]     *See id.*

[4]     *See id.*

well on the Keenans' land. The access easement established a ten-foot-wide easement along the western boundary of Lot 3A-2 (the Keenans' half) that would "run[] with the land." The written grant of the access easement was executed and recorded. But at the time the easement was granted, only the northern part of it, coinciding with Jerry's Trail, was in use; the southern part, bordering the Keenans' land, was mostly undeveloped. Wade continued to use Jerry's Trail and never further developed the rest of the easement along the Keenans' land.

### C. The Meyers Take Ownership Of Lot 3A-1.

In 2010 Wade sold Lot 3A-1 to Jackson and Kandice Meyer. The Meyers believed that the 1994 memorandum agreement (among Keenan, Wade, and the Lot 1 owners) granted water rights to the well on Lot 3A-2 to all subdivision properties, including theirs. They confirmed that a series of easements granted them motorized access from Jakolof Bay Road, and they understood that the Lot 1 and 2 owners and the Keenans drove to their properties using highway-legal vehicles; the Meyers also understood that Wade had driven to Lot 3A-1 via Jerry's Trail.

The Meyers promptly began renovating the cabin on Lot 3A-1. In the course of the renovations, in late 2010 or early 2011, the Meyers disconnected the Keenans' sewage pipe; this caused a backup in the Keenans' house, and, as the superior court later found, "did not contribute to good feelings between the neighbors."

The Meyers' renovations required the regular transportation of equipment and materials to their property. They primarily used Jerry's Trail for this until, in July 2011, the Lot 2 owner informed them "that he was closing their access across Lot 2 based on pressure from others in the MacDonald Spit community." Turning instead to the unused access easement along the western edge of the Keenans' lot, the Meyers discovered that it would not be passable without significant improvement.

In the fall of 2011 the Meyers cleared the access easement and made improvements to the Lot 3 well, rotating the well house to reduce its encroachment on the easement. But in spring 2012 the Keenans rotated the well house to again encroach on the easement. The Keenans also placed a burn barrel in the easement, blocked the northern end with large rocks, and posted signs at each end declaring it could only be used for pedestrian traffic. The Meyers dropped their attempts to develop it.

**D.      The Keenans Initiate Legal Action Regarding The Meyers' Use Of The Access Easement And Water Rights.**

In April 2012 the Keenans sent the Meyers a letter threatening legal action if the Meyers further developed the access easement. The Keenans asserted that use of the easement was limited to pedestrian traffic, and then only when tidal conditions prevented use of the Beach Access Trail in conjunction with another trail, to the northeast of the Meyers' lot, known as the Crossover Trail. The Meyers stopped using the access easement altogether, but they also consulted a lawyer and by letter asserted their right to continue making reasonable improvements to it.

In July 2012 the Keenans filed a complaint seeking a permanent injunction that would prohibit the Meyers from modifying the access easement, as well as compensatory damages for the "destruction of the trees, brush and foliage" in the easement. They also sought a declaration that the Meyers had no rights to water from the Lot 3 well. The Meyers counterclaimed for an injunction protecting their right to use the access easement for motorized traffic, for a declaration of their water rights, and for compensatory damages. The superior court dismissed the water rights claims in June 2013 for lack of subject matter jurisdiction; by that time, the Meyers had a water rights application pending with the Department of Natural Resources (DNR).

In late October 2013 the Keenans cut off the Meyers' water supply. The Meyers filed suit to have the water restored; the case was dismissed with instructions that

the Meyers could amend their answer and counterclaims to include the claim in the Keenans' 2012 lawsuit. In December 2013 the DNR issued a permit to the Meyers granting them water rights to the Lot 3 well as long as they could obtain "legal access" to the well. But the Keenans did not restore the Meyers' water supply until late February 2014. That spring, Keenan also constructed a new, larger well house, intruding much farther into the access easement. The superior court would later conclude that the increased intrusion "was no accident."

### E. The Superior Court Rules In Favor Of The Meyers.

The superior court held a four-day bench trial in January and March 2015, issued a decision in August, and issued a more expansive set of supporting factual findings and conclusions of law in December. The court concluded that the Meyers had a right to use the access easement for "pedestrian, ATV, and car/light truck travel," and that they had access to the Lot 3 well by implied easement, easement by estoppel, and easement by necessity.

The court also awarded the Meyers compensatory damages: $42,000 for the loss of use of their house for the four-month period they were without water ($350 per day for four months) and $33,150 for the loss of use of the access easement during the pendency of the litigation ($25 per day from the time of the first letter threatening legal action to the date of final judgment). The court declined to award punitive damages because they had not been pleaded or placed at issue in the pretrial proceedings; it observed, however, that punitive damages would have been merited if they had been pleaded, because the Keenans' actions "were outrageous, were done with bad motives, and showed reckless indifference to the Meyers' rights."

The Meyers moved for attorneys' fees, and the superior court granted them full reasonable fees in the amount of $157,418. The court enhanced the baseline fee award set out in Alaska Civil Rule 82(b)(1) to 75% of full fees by applying several

factors of Rule 82(b)(3); it then concluded that the remaining 25% of full fees should also be awarded because of the Keenans' vexatious or bad faith conduct during the litigation.

The Keenans appeal the compensatory damages award and the award of full attorney's fees.

## III. STANDARDS OF REVIEW

"[D]eciding the amount of compensatory damages is the job of the finder of fact" and is therefore reviewed for clear error.[5] "So long as the trial judge 'follows the correct rules of law, and [the judge's] estimation appears reasonable and is grounded upon the evidence, [the judge's] finding will remain undisturbed.' "[6]

"We review an award of attorney's fees under Alaska Civil Rule 82 for abuse of discretion."[7] We will only find an abuse of discretion if an award is "arbitrary, capricious, manifestly unreasonable, or the result of an improper motive."[8] "[B]ecause an enhanced fee award under Rule 82(b)(3)(G) 'calls into question [a party's] litigation conduct and the potential merits of [the party's arguments and defenses], we assess de novo the legal and factual viability of [the party's claims] and review relevant findings of fact for clear error.' "[9]

---

[5]     *Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 393 (Alaska 2017).

[6]     *Pluid v. B.K.*, 948 P.2d 981, 983 (Alaska 1997) (quoting *Morrison v. State*, 516 P.2d 402, 405 (Alaska 1973)).

[7]     *Keenan*, 182 P.3d at 1105 (citing *Ashley v. Baker*, 867 P.2d 792, 796 (Alaska 1994)).

[8]     *Johnson v. Johnson*, 239 P.3d 393, 399 (Alaska 2010) (quoting *McGee v. McGee*, 974 P.2d 983, 987-88 (Alaska 1999)).

[9]     *Herring v. Herring*, 373 P.3d 521, 528 (Alaska 2016)  (second alteration
(continued...)

## IV. DISCUSSION

The Keenans challenge the superior court's award of compensatory damages, arguing that the award was unsupported by the evidence and that part of it constituted an impermissible double recovery. They also challenge the superior court's award of full attorney's fees to the Meyers. We conclude that the superior court's findings of fact are not clearly erroneous and that they support its damages award; we also conclude that the court did not abuse its discretion in its award of attorney's fees.

### A. The Superior Court Did Not Clearly Err In Its Award Of Compensatory Damages.

The superior court awarded compensatory damages in two categories. First, it awarded damages based on "a reasonable rental rate for the Meyers' house" for the four months their water was cut off, calculated at $350 per day from October 27, 2013 to February 24, 2014. Second, the court awarded damages for the inconvenience of being unable to use the access easement for 1,326 days, calculated at $25 per day from April 26, 2012, when the Meyers received a letter from the Keenans threatening legal action over their use of the easement, to December 7, 2015, when judgment was entered. The Keenans challenge both these awards, arguing that they are unsupported by the evidence. They also argue that the superior court's calculation results in an impermissible double recovery because it compensates the Meyers for loss of access to the property for four months for which they are also compensated for loss of use of the house.

---

**9** (...continued)
in original) (quoting *Johnson*, 239 P.3d at 399).

Loss-of-use damages may be awarded when a property owner has been temporarily deprived of the property's use.[10] "[R]ental value . . . is one permissible standard for measuring damages for loss of use."[11] Damages may also be "measured by the 'reduction of the rental or usable value of the property' during the pendency of the injury."[12] "The plaintiff bears the burden of proving damages, but once the existence of damage has been established, the amount of loss need not be proved with mathematical precision."[13]

> **1.  The superior court did not clearly err in its assessment of damages for the loss of use of the Meyers' house.**

The Keenans raise three challenges to the court's award of damages for the Meyers' loss of use of their cabin. First, they contend that "the number of days used in the [court's] calculation . . . was far too high given the evidence in the record" because "the Meyers did not use the property every day of the year, particularly during the winter months." But their argument is not supported by the law. Section 931 of the Restatement (Second) of Torts, which we followed in *Ben Lomond, Inc. v. Campbell*, states that a property owner is entitled to damages for loss of use of property even if "the

---

[10]    RESTATEMENT (SECOND) OF TORTS § 931 (AM. LAW INST. 1979).

[11]    *Burgess Constr. Co. v. Hancock*, 514 P.2d 236, 238 (Alaska 1973).

[12]    *Scribner v. Summers*, 138 F.3d 471, 472 (2d Cir. 1998) (per curiam) (quoting *Guzzardi v. Perry's Boats, Inc.*, 460 N.Y.S.2d 78, 82 (N.Y. App. Div. 1983)).

[13]    *City of Seward v. Afognak Logging*, 31 P.3d 780, 787 (Alaska 2001) (citing *Conam Alaska v. Bell Lavalin, Inc.*, 842 P.2d 148, 154 (Alaska 1992))*; cf. CTI Int'l, Inc. v. Lloyds Underwriters*, 735 F.2d 679, 684 (2d Cir. 1984) (noting that under New York law, "a showing of actual financial loss is not an element of the property owner's prima facie case" for loss of use, so even "in the absence of evidence from either side as to actual financial loss attributable to deprivation of use of the property, the owner may recover compensation for loss of use").

owner in fact has suffered no harm through the deprivation, as when he was not using the subject matter at the time or had a substitute that he used without additional expense to him."[14] *Ben Lomond* involved a claim for loss of use of equipment; we noted our earlier rejection of a requirement that the injured party prove "that in fact he hired a replacement . . . before he can establish loss of use [damages]."[15] Here, the Meyers were entitled to recover for their loss of the cabin's use even though their primary home was elsewhere and even though they declined to spend money on a replacement property. The Keenans' actions affected not just the Meyers' actual use of the cabin but also their right to use and enjoy it when and as they wished.

It is true that "[t]he use to which the . . . land is commonly put and the time of year in which the . . . deprivation occurs are . . . to be taken into consideration as far as these factors bear upon the value of the use to the owner or the rental value."[16] The Meyers conceded that most MacDonald Spit properties are used only in the summer. But the superior court found that the Meyers' cabin had amenities that made it comfortable even in the winter. And the Meyers presented evidence that they would have used the cabin in the winter if they had had water; Jackson Meyer testified that his family would have "been there a lot that winter" because it was such a good snow year. The Keenans

---

[14]     691 P.2d 1042, 1045-46 (Alaska 1984) (quoting RESTATEMENT (SECOND) OF TORTS § 931 cmt. b (AM. LAW INST. 1979)); *see also Pope v. Heritage Cmtys., Inc.*, 717 S.E.2d 765, 774-75 (S.C. App. 2011) (deciding there was no reversible error in finding commonality between permanent residents and non-permanent residents seeking loss-of-use damages; finding no error in crediting expert's theory "that a non-permanent resident was entitled to the same loss-of-use damages as a permanent resident" because loss of use may be "based on habitability, not on occupancy").

[15]     *Ben Lomond*, 691 P.2d at 1045 (alterations in original) (quoting *Burgess Constr. Co.*, 514 P.2d at 238).

[16]     RESTATEMENT (SECOND) OF TORTS § 931 cmt. b (AM. LAW. INST. 1979).

dispute the credibility of this testimony, but the superior court found it credible and we see no reason to disturb its conclusion.

The Keenans' second challenge to the loss-of-use award for the cabin is that the estimated rental rate of $350 a night, based on rental rates for a somewhat comparable home, "could only have been [based on] a summer rate"; they contend the rate should have been significantly less in winter. The Keenans based their argument on what "[c]ommon experience and logic both make plain," but they point to no evidence in the record that supports a lower winter rate. The superior court's number was based on Jackson Meyer's testimony that the most comparable home he could find in the area was in the nearby community of Halibut Cove; that property had one bedroom (as opposed to the Meyers' two-bedroom cabin), did not have direct beach access, and rented for $300 per night. The Keenans did not cross-examine Meyer on the rental rate. Though the Keenans imply that the difference between summer and winter rental rates is a judicially noticeable fact, we disagree.[17] Given the superior court's detailed findings regarding the rental rate and the absence of contradictory evidence, we can see no clear error in the number it selected.

Finally, the Keenans argue that the damages award for loss of use of the cabin was unwarranted because the Meyers could still "easily access the house" and, "[h]ad they wanted, . . . could have hauled water with them." But we see no clear error in the superior court's finding that "fresh water is necessary to the reasonable enjoyment of the Meyers' property — the Meyers' [h]ouse includes a fully plumbed bathroom and kitchen." In fact, Michael Keenan conceded in his testimony that he "shut off . . . realistic use of [the Meyers'] house" when he cut off their water supply for the winter.

---

[17] Alaska R. Evid. 201(b) ("A judicially noticed fact must be one not subject to . . . reasonable dispute . . . .").

In sum, the superior court's findings of fact support its award of damages for the Meyers' loss of use of their cabin while they were without water.

### 2. The superior court did not clearly err in assessing damages for the Meyers' loss of use of the access easement.

The Keenans also challenge the court's award of damages for loss of use of the access easement. They argue first that there was no evidence the Meyers ceased using the access easement in April 2012, when the court's damage calculation began; instead, they contend, the Meyers did not suffer the "inconvenience" of using the more circuitous route until at least June 2014, when they "actually began using the Crossover Trail" instead to access their property. But the Meyers did present evidence that they were deprived of full use of the easement because of the Keenans' threat to sue. Jackson Meyer testified that his family stopped using the access easement in April 2012, after receiving the attorney's letter threatening legal action. And Michael Keenan conceded that the Meyers "agreed not to" make improvements to or drive ATVs across the easement during the pendency of the litigation because of the Keenans' request for an injunction.

Again, the law does not require the Meyers to show that they actually would have used the easement every day for which they claim damages; they need only show that they were deprived of their lawful right to make reasonable use of the easement.[18] Because the evidence supports the superior court's conclusion that the

---

[18] *See Burgess Constr. Co.*, 514 P.2d at 238 (rejecting argument that plaintiff must establish that he hired a replacement vehicle before he can establish loss of use of the vehicle); *Moylan v. Dykes*, 226 Cal. Rptr. 673, 680 (Cal. App. 1986) ("When a person interferes with the use of an easement he deprives the easement's owner of a valuable property right and the owner is entitled to compensatory damages."); *Holmes v. Raffo*, 374 P.2d 536, 541 (Wash. 1962) ("The value of an article to its owner . . . lies in his right to use, enjoy, and dispose of it. These are the rights of property which (continued...)

Meyers made such a showing, we affirm its award of loss-of-use damages related to the access easement.

> **3.**   **The superior court's award of compensatory damages for both loss of use of the easement and loss of use of the house did not constitute an impermissible double recovery**.

The Keenans also argue that awarding damages "for loss of use of the property under both a lack of water theory and a lack of access theory" during the four months from late October 2013 to late February 2014 "constitutes an impermissible double recovery." They argue that "[t]he access easement has no independent value except as a means to get to the cabin," and if the lack of water made the cabin unusable, then the Meyers cannot have been further harmed by the lack of access to an unusable cabin.

But loss of use of the easement did not entirely preclude the Meyers from using their cabin, and loss of use of the cabin did not preclude the Meyers from using the rest of their property. As the Meyers point out, even without running water they could still benefit from convenient vehicle access, "for example, to work on the property." Despite the overlapping time periods, these were two distinct injuries which merited distinct damages awards; the superior court did not err in calculating damages separately for each injury.

---

[18]     (...continued)
ownership vests in him, and whether he . . . avails himself of his right of use does not in the least affect the value . . . .").

**B.      The Superior Court Did Not Abuse Its Discretion By Awarding The Meyers Full Attorney's Fees.**

The superior court found that "the Meyers reasonably and necessarily incurred legal fees in the amount of $157,418" and that as prevailing parties they were "entitled to a baseline Rule 82 award of . . . $11,024.89."[19] But the court also found that this number should be enhanced under Rule 82(b)(3), which lists factors relevant to whether "a variation [from the baseline fee] is warranted." The court considered six factors: (1) the complexity of the litigation; (2) the reasonableness of the attorneys' hourly rates; (3) the reasonableness of the attorney hours expended;[20] (4) the reasonableness of the number of attorneys used; (5) the reasonableness of the claims and defenses pursued by each side; and (6) vexatious or bad faith conduct. The court determined that the first five factors merited an increase in the Meyers' fee award "to 75% of the fees they reasonably and necessarily incurred." The court relied on the last factor, the Keenans' vexatious or bad faith conduct during the course of the litigation, to award "the remaining 25% of [the Meyers'] reasonably and necessarily incurred legal fees." The Keenans acknowledge that the Meyers were entitled to some attorney's fee award, but they challenge the justifications the superior court used to enhance the award to 100% of full reasonable fees.

---

[19]      This amount reflects 20% of the first $25,000 awarded plus 10% of the remainder, as prescribed by the fee schedule outlined in Rule 82(b)(1).

[20]      "[T]he reasonableness of the attorneys' hourly rates and the number of hours expended" is a single factor under Rule 82(b)(3)(C), but the superior court analyzed "[t]he reasonableness of the attorneys' hourly rates" and "[t]he reasonableness of the attorneys' time charges" as separate factors.

**1. The superior court did not abuse its discretion by using Rule 82(b)(3)(C) (reasonableness of hourly rates and hours expended) and (D) (reasonableness of number of attorneys) to support a fee enhancement.**

The Keenans first argue that two of the Rule 82(b)(3) factors — (C) (the reasonableness of the billing rate and the hours billed) and (D) (the reasonableness of the number of attorneys used) — do not support a fee enhancement; instead, they contend, these factors can appropriately support only a reduction. But they cite no support for this proposition, and our case law contradicts it. We concluded in *Ware v. Ware* that a judge's "citation of factor (C) (the reasonableness of the fees and hours expended) . . . as supporting an enhanced award [was] not an abuse of discretion."[21] And there is nothing about the language of the rule itself — which allows a "variation" of the award "upon consideration of the factors listed" — that limits use of any of the factors to only enhancements or only reductions.[22]

The Keenans do not challenge on appeal the superior court's specific findings that the Meyers' case was efficiently staffed, that the Meyers were charged "exceptionally reasonable" rates for the Anchorage market, or that the Meyers' attorneys billed them for a reasonable number of hours. Having made these findings, the superior court acted within its discretion when it relied on factors (C) and (D) to enhance the Meyers' fee award.

---

[21]  161 P.3d 1188, 1200 (Alaska 2007) (affirming an award of 80% of attorney's fees); *see also Crittell v. Bingo*, 83 P.3d 532, 536-37 (Alaska 2004) (affirming enhanced attorney's fee award based in part on reasonableness of attorney's hours and hourly rates).

[22]  Alaska R. Civ. P. 82(b)(3).

## 2. The superior court did not abuse its discretion by using Rule 82(b)(3)(A) (complexity) and (F) (reasonableness of parties' positions) to support a fee enhancement.

We have repeatedly upheld trial courts' authority to consider case complexity when deciding whether to enhance attorney's fee awards.[23] The Keenans appear to concede that this case was complex. They argue, however, that the case's complexity belies the superior court's concurrent finding of unreasonableness; if their positions were really so "unreasonable," they argue, "this litigation would not have taken four years or required the level of evidence, briefing, trial testimony, and lengthy judicial decisions that ultimately ensued."

But unreasonable positions can make a complex case more difficult than it needs to be. In *Cole v. Bartels* we affirmed an enhanced fee award after concluding that the superior court did not abuse its discretion by finding that a case was complex and that the nonprevailing party's claims and defenses were unreasonable.[24] In *Ware* we affirmed an enhanced fee award that was based in part on a finding that the plaintiff's assertion of unreasonable claims increased the litigation's difficulty and complexity.[25] The superior court in this case did not abuse its discretion by relying simultaneously on factors (A) and (F).

The Keenans also challenge the superior court's finding that some of their positions were unreasonable: (1) insisting that the access easement could be used only

---

[23]    *Ware*, 161 P.3d at 1200.

[24]    4 P.3d 956, 960-61 (Alaska 2000).

[25]    161 P.3d at 1199-1200; *see also Crook v. Mortenson-Neal*, 727 P.2d 297, 306 (Alaska 1986) (affirming an enhanced award based on the superior court's finding that "[d]efendants insisted on litigating a weak and incredible defense" that "caused plaintiff justifiably to expend considerable effort on motions and trial practice").

for foot traffic and only during extreme tides, despite having themselves granted and recorded an easement that "runs with the land" and does not contain those restrictions; (2) claiming that the Meyers cut mature trees on the easement despite the absence of supporting evidence; and (3) denying the Meyers the use of the well despite the fact that the Meyers' predecessor used it and the well had "all the earmarks of a community well." The Keenans argue that although they did not ultimately succeed on these issues, their arguments were nonetheless "legitimate."[26]

The Keenans' first argument — that there was a legitimate dispute about whether the access easement could be used for more than just foot traffic at high tide — was contradicted by the grant of the easement itself; it was drafted and signed by Michael Keenan, it contained no restrictions, and it expressly ran with the land. The Keenans argue that the reasonableness of their position on this point is nonetheless proven by the doggedness with which they maintained it. But as we have noted before, consistency in argument does not prove reasonableness; a party's "insist[ence] on litigating a weak and incredible [position] to its highly predictable conclusion" may justify an enhanced fee award.[27] The fact that the Keenans persisted in their claim required both parties to expend considerable time, expense, and effort litigating (as the Keenans themselves describe it) "the nature of the property, the suitability of the Crossover Trail as a primary means of access, community norms involving vehicular travel, and the intent of the parties who created the easement." We see no reason to disturb the superior court's

---

[26]    *See Marathon Oil Co. v. ARCO Alaska, Inc.*, 972 P.2d 595, 605 (Alaska 1999) (nonprevailing party's challenge to an arbitration award "raised a legitimate issue" so factor (F) could not be used to justify an enhanced fee award).

[27]    *Crook*, 727 P.2d at 306; *see Ware*, 161 P.3d at 1200 (affirming application of factor (F) when a party "persisted in her claims despite" evidence which "clearly refuted" the party's claims).

finding that the Keenans staked out and held firmly to an unreasonable position on the access easement which contributed to the cost of the litigation.

The Keenans also dispute the superior court's finding that they unreasonably "insisted that the Meyers had no right to cut vegetation over the access [easement] and claimed, without any credible evidence, that the Meyers had cut large, mature trees." The Keenans argue that the court's ruling "amounts to punishing one party . . . because one detail of its presentation—'mature trees'—was rejected by the finder of fact." But the Keenans' claim that the Meyers were going overboard in brushing out the easement was at the heart of their original complaint, including their requests for injunctive relief and treble damages. And though the Keenans presented some evidence on this issue — Michael Keenan's testimony, several photographs, and evidence that the Meyers had offered the Keenans firewood produced from brushing the easement — the superior court did not find their position credible. The court rejected Michael Keenan's testimony as imprecise, found that "[t]he stumps that he generally alluded to in the photographs" appeared to have been cut years before the dispute arose, and found that the vegetation cut by the Meyers grew back by the next summer, "leaving the area virtually indistinguishable from when the Meyers had cut it" and resulting in, at most, "negligible" harm to the easement. "[T]he superior court [i]s in the best position to evaluate the [parties'] demeanor and credibility."[28] The court's credibility findings support its conclusion that the Keenans' claim about the Meyers' clearing activities in the easement was unreasonable.

Finally, the Keenans challenge the superior court's conclusion that the Keenans "lacked a reasonable basis for denying use of the well to the Meyers." The Keenans argue that their position was reasonable because their agreement with Wade

---

[28]     *Crook*, 727 P.2d at 306.

gave him only a personal right to the well water. But they supported this claim with arguments the superior court could reasonably conclude were inconsistent and meritless. As the superior court described their argument, they were not bound by a 1994 memorandum agreement granting Lots 1, 2, and 3 equal rights to the well because Michael Keenan expected the agreement would not be recorded, but at the same time they intended the agreement to be enforceable against the other lot owners in the event the Keenans' well proved unproductive and they had to look to one of their neighbors for water. Moreover, the superior court found that Keenan, "an experienced attorney," should have known better than to "terminate[] the water supply in spite of a previous court's order requiring him to maintain Lot 3A-1's access to the community well." Because the superior court did not err when it weighed Rule 82(b)(3) factors (A), (C), (D), and (F) against the Keenans, we affirm its award of 75% of the Meyers' attorney's fees.

### 3. The superior court did not abuse its discretion by using Rule 82(b)(3)(G) (vexatious or bad faith conduct) to support a fee enhancement.

The Keenans also challenge the superior court's use of Rule 82(b)(3)(G) — vexatious or bad faith conduct — to further enhance the 75% fee award to full reasonable fees. The court properly observed that in order to support such an enhancement it must first find that the Keenans engaged in "bad faith conduct . . . [that] occurr[ed] during the litigation, not during the underlying transaction that is the subject of the litigation."[29] Accordingly, the court concluded that the Keenans took actions outside of court that nonetheless constituted "a heavy-handed attempt to unfairly pressure their adversary in the course of the litigation." The court cited the facts that "the Keenans[] intentionally cut off [the Meyers'] water supply more than a year after this suit

---

[29] *Cole*, 4 P.3d at 961 n.24.

-19-                                                                    7259

was filed" and then, when "they resumed supplying water, the Keenans stepped up their obstruction of the access easement . . . [by] construct[ing] a new and much larger well house, which intruded 'to a substantially greater extent' " into the easement.

The Keenans dispute that the court's findings adequately support a fee award under factor (G). They argue first that factor (G) requires a finding of "dishonesty of belief or purpose" or an "absence of good faith" and contend that the Meyers made no such showing. But the trial court is "in the best position to determine whether a party's behavior was excessively litigious or in bad faith."[30] Following trial the superior court here found that the evidence established, "clearly and convincingly, that the Keenans' actions — in particular, prohibiting the Meyers from improving and using the [a]ccess [e]asement and then unilaterally terminating the water supply to Lot 3A-1 — were outrageous, were done with bad motives, and showed reckless indifference to the Meyers' rights." The court cited both Michael Keenan's contravention of a prior court order that required him to preserve "access to the community well" for Lot 3A-1 and his efforts to "deny the enforceability of [the 1994 memorandum agreement] he drafted when it became inconvenient." In its fee order the court also noted the suspicious timing of the Keenans' actions in shutting off the water supply and then "step[ping] up their obstruction of the access easement" during the litigation. These unlawful actions, the court found, were intended to maintain pressure on the Meyers as the Keenans' litigation

---

[30]     *Reid v. Williams*, 964 P.2d 453, 461-62 (Alaska 1998) (citing *Hanson v. Kake Tribal Corp.*, 939 P.2d 1320, 1331 (Alaska 1997)); *Stone v. Int'l Marine Carriers, Inc.*, 918 P.2d 551, 558 (Alaska 1996); *Wickwire v. McFadden*, 633 P.2d 278, 281 n.6 (Alaska 1981)).

adversaries. We are not persuaded that the court's findings of bad faith were clearly erroneous.[31]

We turn to the second part of the Keenans' argument: that the vexatious or bad faith conduct on which the superior court relied did not occur in the litigation. We have held that the use of factor (G) to enhance a fee award must depend on conduct "during the litigation" and cannot depend on conduct "during the underlying transaction that is the subject of the litigation."[32] We have further emphasized that the conduct "must be such that the parties are prevented from litigating the action on an equal plane."[33]

The Keenans do not appear to dispute that cutting off the Meyers' water supply and expanding the well house to impede the access easement were actions taken "during the litigation." They argue, however, that these were not actions taken *in* the litigation, but rather "were actions taken consistent with the Keenans' positions about the legal rights that were the subject of this litigation." But regardless of whether the Keenans' actions were taken out of court and were consistent with their pre-litigation positions, we cannot fault the superior court's conclusion that they were taken during the course of the litigation specifically to "unfairly pressure their adversary." The court's factual findings support its conclusion. Despite knowing that the Meyers' cabin was

---

[31]    *See Garrison v. Dixon*, 19 P.3d 1229, 1235 (Alaska 2001) (holding that because the evidence supported trial court's "factual findings that the case was litigated in bad faith," "the superior court did not abuse its discretion in awarding full, actual attorney's fees under Rule 82").

[32]    *Cole*, 4 P.3d at 961 n.24; *see also Hopper v. Hopper*, 171 P.3d 124, 127, 133-34 (Alaska 2007) (reversing fees award because appellee's bad faith conduct related to drafting of a dissolution agreement, not to conduct during the later litigation to set aside the agreement).

[33]    *Kowalski v. Kowalski*, 806 P.2d 1368, 1373 (Alaska 1991).

dependent on the Lot 3 well, the Keenans cut off the water supply in the middle of litigation. When the Meyers filed an amended counterclaim and moved for a preliminary injunction to regain water access, the Keenans restored the water but maintained pressure on the Meyers by building the well house further into the easement. The superior court could reasonably conclude, as it did, that these bad-faith actions were taken specifically to give the Keenans leverage in the ongoing litigation.[34] As such they were properly considered in the context of Rule 82(b)(3)(G).

### 4. The superior court did not improperly use a full attorney's fee award as a substitute for punitive damages.

Finally, the Keenans argue that the superior court improperly used the award of full attorney's fees as a substitute for the punitive damages the Meyers failed to ask for in their complaint or to pursue during the litigation. They contend this was improper because "fee awards are intended to partially compensate prevailing parties and may not be used for any other purpose. Specifically, fee awards designed to punish litigants are forbidden."

The Keenans are correct that "Rule 82's primary purpose is to partially compensate a prevailing party for attorney's fees incurred in enforcing or defending the party's rights," in recognition of the fact that "[i]f fees were not allowed, the prevailing party would suffer a loss in spite of its victory."[35] "It is not the purpose of Rule 82 to penalize a party for litigating a good faith claim . . . ."[36] But while we have "expressed

---

[34] *Northlake Mktg. & Supply, Inc. v. Glaverbel, S.A.*, 72 F. Supp. 2d 893, 908 (N.D. Ill. 1999) (finding that a party's "extrajudicial conduct . . . amounts to bad faith conduct" for purposes of damages and attorney's fee award).

[35] *State v. Native Vill. of Nunapitchuk*, 156 P.3d 389, 397-98 (Alaska 2007).

[36] *Gilbert v. State*, 526 P.2d 1131, 1136 (Alaska 1974), *superseded by statute*
(continued...)

concern that 'financially ruinous' fee awards against *good faith* civil litigants could deter access to the courts,"[37] we have regularly affirmed full fee awards against bad faith litigants.[38] We have explained that full fee awards against bad faith litigants are unlikely to deter good faith claims,[39] and an enhanced award for bad faith conduct helps compensate the prevailing party for effort and expense that may have been avoidable had the other party acted in good faith. For these reasons, in *Crittell v. Bingo* we rejected an argument — identical to the Keenans' — that "the superior court's award of enhanced fees was an unlawful award of punitive damages."[40]

As evidence that the superior court was wrongly motivated, the Keenans point to the reference in its fees order to its earlier decision rejecting punitive damages because they had not been pleaded. The court noted its earlier finding that some of the Keenans' actions "were outrageous, were done with bad motives, and showed reckless indifference to the Meyers' rights." But the court adequately explained why the Keenans' actions warranted an award of full attorney's fees. The court did not say that it was awarding full fees in lieu of punitive damages, and we will not infer such an intent when the full fee award was itself well supported.

---

[36]      (...continued)
*on other grounds as stated in Nunapitchuk*, 156 P.3d at 391 n.1.

[37]      *Crittell v. Bingo*, 83 P.3d 532, 537-38 (Alaska 2004) (emphasis in original) (quoting *Reid v. Williams*, 964 P.2d 453, 462 (Alaska 1998)).

[38]      *See id.*; *Garrison v. Dixon*, 19 P.3d 1229, 1234-35 (Alaska 2001); *Keen v. Ruddy*, 784 P.2d 653, 657 (Alaska 1989).

[39]      *Crittell*, 83 P.3d at 537-38.

[40]      *Id.*

## V.    CONCLUSION

We AFFIRM the superior court's awards of compensatory damages and full attorney's fees.



**APPENDIX**

7259